**Lester W. PROKOP, Appellant,**

v.

**Linhart J. KRENEK, Appellee.**

**No. 11133.**

Court of Civil Appeals of Texas.

Austin.

Jan. 8, 1964.

Rehearing Denied Jan. 22, 1964.

Fulbright, Crooker, Freeman, Bates & Jaworski, St. John Garwood, Jr., Houston, for appellant.

De Lange, Hudspeth & Pitman, Houston, for appellee.

HUGHES, Justice.

Lester W. Prokop, appellant, sued Linhart J. Krenek for rescission of a sale of 6000 shares of stock in the Texas State Oil and Gas Corporation, a Delaware Corporation, made by Krenek to appellant and for the return of the purchase price paid therefor, $4000.00, with interest.

The sale of stock to appellant by Krenek was made May 25, 1959. Appellant pleaded

that at such time the stock sold was not registered as required by the Securities Act (Texas) and he invoked the remedy of rescission as provided in the Act.[1]

Appellee answered by pleading that any sale of corporate stock made by him to appellant was an exempt transaction under Sec. 5 of the Act.[2]

Additionally appellee denied that a proper tender of the stock sold had been made and denied that all conditions precedent to his liability under the Act had been performed. He also alleged that a dismissal with prejudice of the Texas State Oil and Gas Corporation from this suit released him from liability herein.

Trial was to a jury. When the parties rested they each made a motion for an instructed verdict. The motion of appellant was denied; the motion of appellee was granted. Judgment that appellant take nothing by his suit was accordingly rendered.

The facts are rather involved and confusion is compounded by the presence, in the record, of two corporations, similarly named, the Texas State Oil and Gas Corporation, a Delaware Corporation, and its predecessor, The Texas State Oil Company, a Texas corporation. To lessen confusion, we will refer to the former as the "Delaware Corporation" and to the latter as the "Texas Corporation."

■ It is undisputed that the stock of neither corporation was registered by the Act or that a permit therefor had been issued at the time of the sale of stock from Krenek to appellant. It is of primary importance, therefore, that we determine whether or not such sale was an exempt transaction under the Act. The burden of establishing such exemption is, by the Act[3] placed upon the person claiming such exemption. This person is appellee and under this record he must establish it by conclusive evidence in order that the judgment in his favor stand.

1. Art. 581–33 provides in part:
"Every sale or contract of sale of any security made in violation of any provision of this Act shall be voidable at the election of the purchaser, who shall be entitled to recover from the seller in an action at law, upon tender to the seller of the security sold, in proper form for transfer, together with the amount of all dividends, interest, and other income and distributions received by the purchaser from or upon such security, the full amount paid by such purchaser for such security, with interest from the date of purchase; * * * and provided further, that no purchaser shall bring any action under this Act against the seller unless: (1) at least fifteen (15) days before filing suit; he shall have made a written demand on the seller for a refund of the full amount paid by the purchaser for the security, with interest from the date of purchase, less the amount of any income from such security that may have been received by the purchaser, and he shall have tendered to the seller the securities sold in proper form for transfer; and (2) the seller shall not have made such re-

fund and accepted such tender within the said fifteen (15) days."

2. The pleading is drawn under Art. 581–5, subd. C(1) which provides:
"Sales of securities made by or in behalf of a vendor, whether by dealer or other agent, in the ordinary course of bona fide personal investment of the personal holdings of such vendor, or change in such investment, if such vendor is not engaged in the business of selling securities and the sale or sales are isolated transactions not made in the course of repeated and successive transactions of a like character; provided, that in no event shall such sales or offerings be exempt from the provisions of this Act when made or intended by the vendor or his agent, for the benefit, either directly or indirectly, of any company or corporation except the individual vendor (other than a usual commission to said agent), and provided further, that any person acting as agent for said vendor shall be registered pursuant to this Act; * * *."

3. Art. 581–37.

It is our opinion that the sale of stock from appellee to appellant was intended by appellee for the benefit, directly or indirectly, of another company or corporation, and hence not an exempt transaction under the Act. See footnote 2.

We will recite the pertinent facts as briefly as the record permits.

Appellee, his two brothers and another person organized the Texas corporation in 1957. For a time they owned its controlling interest. Appellee was a director and officer of such corporation during all the times relevant to this suit.

In April 1959, appellee's brother and two others organized the Delaware corporation and appellee, although not initially, subsequently became its vice president. The purpose of organizing this corporation was to increase the capital stock of the Texas corporation by exchanging three shares of stock in the Delaware corporation for one share in the Texas corporation. The Delaware corporation was to and did take over all the assets of the Texas corporation and it assumed all of its liabilities. The stockholders in both corporations were identical, only the amount of stock being increased by the ration of 3 to 1. This corporate succession was effected between June 5 and June 20, 1959.

Both corporations had in excess of 35 stockholders. See Art. 581–51, subd. I. Originally, the plan had been to increase the capital of the Texas corporation, "and to apply to the Securities Commission for increase in the sale price of shares." Appellee and appellant were present at a stockholders' meeting in Sealy, Texas where this was voted, in March, 1959. The Texas corporation never carried out this plan, however. At that time, appellee was a director and his brother, Ray Krenek, was secretary.

A group of stockholders, including the treasurer of the Texas corporation, L. J. Sulak, objected to the reorganization—"he didn't want to go Delaware." Accordingly, he and others filed suit, as minority stockholders on behalf of the Texas corporation, and a temporary restraining order was entered and a copy served on appellee on May 8, 1959. The suit was against appellee, his brothers, Talasek, two other individuals and the Delaware corporation. The temporary injunction blocked the reorganization.

Appellant began buying stock in the Texas corporation in 1958 for $1 per share, acquiring a total of 960 shares by March 31, 1959. The total authorized capital of the corporation being 100,000 shares, of which approximately 85,000 had been issued at that time. Appellee remembered meeting appellant at a stockholders' meeting in March, 1959. At this meeting the directors were voted authority to increase the capital from $100,000 to $300,000, appellant making the motion. Afterwards, appellee went by appellant's place of business "several times" before making the sale to him in May. Appellant would inquire "how the company was," appellee replying "I guess it was alright." Appellee remembered that appellant had "seemed interested in the corporation" ever since the meeting. This interest prompted appellee to approach appellant in May, to sell him stock to raise money needed to buy out L. J. Sulak.

Appellee testified that he, his two brothers, Talasek and two others (co-defendants in Sulak's suit) entered into a written contract to purchase the shares of Sulak and the other plaintiffs in such suit in May, 1959, for $1.50 per share.

This contract provided that upon its consummation the Sulak suit would be dismissed with prejudice. Appellee first testified that he entered into this contract after making the sale to appellant, then that he didn't remember. However, he knew before he went to appellant that "If I could buy quite a bit of it (Sulak's stock), I could get it for a dollar and a half a share." He also testified:

"Q. Did you tell Mr. Prokop that?

"A. No. I didn't tell him that, and I sold him mine for $2.

"Q. At the time you entered into this transaction with Mr. Prokop, you were a vice-president in the Texas State Oil & Gas Corporation?

"A. Right.

"Q. And a member of the Board?

"A. Right.

"Q. And as I understood you yesterday, you didn't disclose to him that you intended to make a profit on this transaction?

"A. Individually, no.

"Q. Did you tell him about it?

"A. No, sir. Why should I tell him?

"Q. You didn't, anyhow?

"A. No. I told him I would sell him mine for $2 a share.

"Q. And that was it?

"A. That was it."

Appellant's check for $4,000, "for 2000 shares of stock," payable to "Texas State Oil Co., Inc." (the Texas corporation) was taken by appellee to the President, Joe Krchnak, who endorsed it. It was then deposited in an account styled the "Musick and Musick collection account," being handled by appellee's attorney, LeVoy Musick. Musick used this money to pay for the Sulak group's stock, to settle the Sulak suit.

Six days after the sale of stock here involved Mr. LeVoy Musick wrote the Texas corporation and its directors in part, as follows:

"You gentlemen are to be congratulated upon saving the Texas State Oil Company, Inc. and at the same time, increasing the assets of the company, gaining new * * * stockholders for the company * * * Your attorneys * * * are pleased and gratified that your excellent suggestions and coopera-

tion contributed largely to the successful conclusion of this dangerous litigation."

Appellee testified that he paid $1.50 for the stock he bought from the Sulak group, $.50 per share less than he received from the stock sold appellant. Of the stock which appellee bought from Sulak he kept only "several hundred shares."

Appellee also testified:

"Q. It was these lawsuits that prompted you to go to see Mr. Prokop?

"A. Not necessarily.

"Q. They had something to do with it, didn't they?

"A. He wanted out. Mr. Sulak either bought us out or we bought him out.

"Q. Did that have something to do with your going to see Mr. Prokop?

"A. Well, I needed money to buy him out.

"Q. Buy Senator Sulak out?

"A. Right.

"Q. And stop the lawsuit? Is that right?

"A. I could have sold him all of my stock. It would have been stopped either way.

"Q. That same buying of the shares was what settled Mr. Sulak's suit against you, wasn't it?

"A. I would say it settled it. It didn't have to."

The Sulak litigation was settled June 1, 1959, six days after the sale to appellant.

While appellee testified that the stock sold appellant was his own, he testified rather ambiguously as follows:

"Q. All right. You never did hold any stock that you sold to Mr.

Prokop, did you—keep it for a long time?

"A. No. Whenever I sold it to Mr. Prokop—I told Musick—*he* sold Mr. Prokop 2,000 shares of stock.

"Q. And you were going to get that stock later from Senator Sulak?

"A. I didn't know whether he was going to get it or not.

"Q. But you didn't have it when you sold it to Mr. Prokop?

"A. Right. I didn't have it.

"Q. But you were going to get it later, by working this trade with Senator Sulak?

"A. Yes, sir.

"Q. And you kept 50¢ a share, yourself in cash?

"A. Yes."

The negotiations with Sulak and his group were taking place at the same time as the sale to appellant.

On the joint stock records for the two corporations the sale to appellant is recorded, but no sale by appellee.

After the Sulak litigation was settled, the Delaware corporation qualified to do business in Texas, on July 23, 1959. After the transfer of assets was effected, the Texas corporation did no further business. Its right to do business was forfeited December 1, 1959 and charter forfeited July 27, 1960.

On June 5, 1959 a letter addressed "Dear Stockholder" from Joe Krchnak, President of the Texas corporation, went out, soliciting a vote in favor of the proposed 3 for 1 exchange. Appellant voted his total of 2960 shares in favor. No certificate in either corporation had been tendered appellant at the time of purchase on May 25, 1959. The three-for-one exchange was approved by the Texas corporation's stockholders.

The Delaware corporation never sold any stock.

Regarding the sale of stock to appellant, appellee further testified:

"Q. You sold him 2,000 shares of stock in what?

"A. The old company, Texas State Oil Company, Inc.

"Q. And that would be 6,000 shares in the new one?

"A. I imagine so.

"Q. Because you were getting three in the new one for one in the old one?

"A. Right."

Appellant testified, positively and without dispute, that the only certificate he ever received was in the Delaware corporation, being No. 474 dated June 20, 1959, for 6000 shares. This stock certificate was obtained from LeVoy Musick, the secretary of the Delaware corporation.

This certificate, properly endorsed for transfer, was sent to appellee on October 18, 1960, who returned it to appellant April 18, 1961. This suit was filed March 24, 1961. This stock certificate was re-tendered to appellee on the trial of this case, and its acceptance was refused.

Appellant received no dividends from the Delaware corporation stock. He did receive two fees for attending directors' meetings of the Delaware corporation, one of which he kept.

This suit originally named the Delaware corporation as a defendant. It was dismissed as to such defendant with prejudice, the order of dismissal reciting that the suit as to appellee remain pending.

This evidence is conclusive that the sale of stock by appellee to appellant was made or intended by appellee for the direct or indirect benefit of the Texas corporation and its alter ego, the Delaware corporation.

Appellee testified that the purpose of the sale was because he needed money to buy the Sulak group shares of stock in the Texas corporation. The importance of this purchase is made obvious by the record. It was to end the litigation brought by the Sulak group which blocked the organization of the Delaware corporation which was desired by another group of stockholders of the Texas corporation. The purpose of this reorganization was, as appellee testified, "I imagine it was to increase our capital in this thing." The Delaware corporation had ten times the capital stock of the Texas corporation and appellee testified that he "imagine(d)" that was one of the reasons for the reorganization.

Certainly, it seems to us, that the Texas and Delaware corporations were benefited by the settlement and dismissal of a vexatious suit which had the effect of blocking, temporarily at least, their reorganization which was desired by owners of a majority of the stock in the two corporations. Appellee having testified that the sale of his stock to appellant was in furtherance of his plans to settle such suit it is our opinion that such sale, as a matter of law, was intended to benefit such corporations. Actual benefit to such corporations resulting from such sale is also shown in that the proceeds of such sale are shown to have been used in settling such suit.

We must now determine the validity of the tender made by appellant in order to comply with Art. 581–33, supra footnote 1.

There was no duty upon appellant to tender a director's fee for attending a meeting of directors. This fee is not, in our opinion, an income or distribution received by appellant from or upon such stock. Since a director, as a rule, is not entitled to compensation for his services, we presume that the fee he receives is in the nature of an expense allowance. Mere stock ownership did not entitle him to this fee. It was paid as a consequence of his being a director and attending a meeting of the directors. Although appellant had to be a stockholder in order to be a director he was not paid a fee for being a stockholder.

With reference to the tender of stock in the Delaware corporation rather than in the Texas corporation, appellee, in his brief, states:

"The evidence also shows that Texas State Oil Company, Inc. was incorporated under the laws of the State of Texas, with a total authorized capital of 100,000 shares, of the par value of $1.00 each. Its corporate purposes were limited to engaging in, transacting and carrying on the business of prospecting for and mining and drilling for oil, gas and all other minerals and doing all things in connection with or incident to the transaction of that business. This corporation remained in existence until July 27, 1960, when its charter was forfeited by the Secretary of State. On the other hand, the Texas State Oil & Gas Corporation was incorporated under the laws of the State of Delaware, with its principal office in Wilmington, Delaware, with all of the powers conferred by the laws of the State of Delaware, specifically including powers to limit the rights of shareholders to inspect the books and records of the corporation and to sell, lease and exchange all of its assets upon a vote of the majority of the issued and outstanding stock. The Delaware corporation had extremely broad and varied (almost universal) purposes, and had an authorized capital of 1,000,000 shares of the capital stock of par value of $1.00 each. The evidence further shows that the Texas corporation, Texas State Oil Company, Inc., had all its 100,000 shares issued and outstanding at the time of the sale from appellee to appellant, whereas only 300,000 shares of the authorized 1,000,000 shares of the capital stock of Texas State Oil & Gas Corporation was issued.

"Appellant offered no evidence of any tender, or of any attempt to tender to appellee any shares of the capital stock of Texas State Oil Company, Inc., the Texas corporation, endorsed in form for transfer, prior to the institution of this suit. Instead, appellant only offered evidence that appellant had mailed to appellee a certificate representing 6,000 shares of the capital stock of Texas State Oil & Gas Corporation, the Delaware corporation, accompanied by a demand for payment to appellant of the sum of $4,000.00, together with interest from the date of the sale of 2,000 shares of the capital stock of Texas State Oil Company, Inc., by appellee to appellant."

To permit this defense by appellee would be to reward him for his own dereliction. When questioned about the sale to appellant and his failure to deliver the stock certificate appellee testified:

"Q. Did you hand Mr. Prokop any certificates at the time you talked with him out there?

"A. No, I didn't have any. I turned mine in for exchange.

\*     \*     \*     \*     \*     \*

"Q. That was more than any 2,000 shares?

"A. Right, because I was turning them in for this exchange, three for one.

"Q. What did you tell Musick when you turned in all of your shares?

"A. They wrote out letters to all stockholders to turn their shares in.

\*     \*     \*     \*     \*     \*

"Q. At the time that you sold the shares of stock to Mr. Prokop, did you have any certificate in your possession representing any shares in the Texas State Oil Company, Inc.?

"A. No, I had turned them in.

"Q. Now, who had you turned them in to?

"A. To the company secretary for the transfer.

"Q. Did you tell Mr. Prokop that you had done that?

"A. Yeah, I told him I turned my shares in to the company. That was why I couldn't give him any shares right then.

"Q. Did you instruct anyone to deliver any shares to Mr. Prokop?

"A. Yeah, I told the secretary of the company to issue him 2,000 shares of stock.

"Q. Did you tell him whose stock it was to be issued out of?

"A. My own personal stock."

The letter referred to by appellee and introduced in evidence by him reads:

"TEXAS STATE OIL COMPANY, INC.
"SEALY, TEXAS
"June 5, 1959

"JOE KRCHNAK,
"PRESIDENT

"Dear Stockholder:

"Your Company plans an advantageous and financially profitable move in the form of a stock exchange with the Texas State Oil & Gas Corporation. Under the plan, the Management will remain the same, the capital of your Company will be substantially increased, and you will receive 3 shares of stock for each share you now hold. A limited number of the new shares will be made available for purchase at $3.00 per share. Under this plan, your holdings are tripled in number of shares and the potential financial growth is unlimited.

"The Management enthusiastically endorses this plan and feels that you

will want to give us your cooperation. Please write '*Yes*' at the bottom of this letter, sign your name, and put it in return mail to your Company. We enclose a stamped envelope to your Company for your convenience. You may enclose your shares of stock, and we will forward your new shares, three for one, within 20 days of receipt.

"We extend kind personal regards and ask God's blessings for you and your family.

> "Sincerely yours,
> "THE MANAGEMENT
> "By: /s/ Joe Krchnak
> "Joe Krchank,
> "President

"JK:sj
"I vote my shares 2960 yes
"Signed: /s/L. W. Prokop"

The old and the new corporations used identical stock certificate numbers and the same stock record book.

This evidence proves as a matter of law that appellee treated the 6000 shares of stock in the Delaware corporation as the equivalent of 2000 shares of stock in the Texas corporation. If this is not true then appellee convicts himself of selling appellant stock which he did not deliver and could never deliver. His instructions to the secretary of the Texas corporation to transfer 2000 shares to appellant are meaningless in view of his testimony that he had turned his stock in for exchange for stock in the Delaware corporation, unless by such instructions he meant the equivalent of 2000 shares in the Texas corporation, i. e. 6000 shares in the Delaware corporation.

It is our opinion that 6000 shares of stock in the Delaware corporation is the legal equivalent of 2000 shares in the Texas corporation, and that the parties so treated them. This practical construction of the sale is binding upon them. If appellant had tendered appellee 2000 shares of stock in the defunct Texas corporation devoid of its exchange privilege for stock in the Delaware corporation we have no doubt but that the tender would be inadequate.

The dismissal, with prejudice, of the Delaware corporation from this suit does not release appellee from liability. Appellee and such corporation are not shown to be joint tort feasors. The release was not given in satisfaction of any damages to appellant. The release expressly reserved the cause of action against appellee. See Skyline Cab Co. v. Bradley, Tex.Civ. App., 325 S.W.2d 176, Houston Civil Appeals, writ ref., n. r. e., 36 Tex.Jur., Release, Secs. 22 and 24.

It is our opinion that the Trial Court should have sustained appellant's motion for an instructed verdict and should have overruled appellee's motion. It is accordingly ordered that the judgment of the Trial Court be reversed and that judgment be here rendered that appellant recover of and from appellee the sum of $4000.00 with interest at the rate of 6% per annum from May 29, 1959, the date of the stock purchase (Art. 581–33), and all costs of suit. It is further ordered that the Clerk of the Trial Court deliver to appellee the stock certificate for 6000 shares in the Delaware corporation held in the registry of the Trial Court upon satisfaction of this judgment.

Reversed and rendered.