**MI–JACK PRODUCTS, INC. and Mi–Jack Intermodel, Appellant,**

v.

**Thomas BRANEFF, Appellee.**

**No. 01–90–00002–CV.**

Court of Appeals of Texas,
Houston (1st Dist.).

March 12, 1992.

Robert M. Roach, Jr., David W. Holman, Solace H. Kirkland, Houston, for appellant.

Larry P. Boyd, Richard L. Lagarde, Houston, for appellee.

Before DUGGAN, COHEN and DYESS,[1] JJ.

## OPINION

DUGGAN, Justice.

This is an appeal from a judgment awarding damages on a jury verdict in favor of the plaintiff in a personal injury case. The controlling issue concerns the application of rule 408 of the Texas Rules of Civil Evidence in determining the admissibility of a "Mary Carter" agreement.[2] We hold, in the circumstances of the case, that evidence of the agreement should have been admitted to prove the *interests* of the settling *parties*.

On October 20, 1982, appellee Thomas Braneff's right leg was crushed by a Travelift gantry crane. The extent of the injury necessitated amputation of his leg below the knee. Braneff sued three defendants, alleging theories of negligence and products liability: Southern Pacific Railroad Company ("Southern Pacific" or "SP"), the owner of the crane; Mi–Jack Products, Inc. and Mi–Jack Intermodel, a division of Mi–Jack Products, (collectively "Mi–Jack"), the assembler and distributor of the crane; and J.I. Case ("Case"), the manufacturer of the crane. Mi–Jack filed cross-actions for contribution and indemnity against SP and Case.

The morning of trial, Braneff entered into a settlement agreement with SP and Case. However, Braneff did not nonsuit these defendants. Neither did Mi–Jack move to sever its cross action against them. Under the terms of the unwritten agreement,[3] Southern Pacific and Case each limited its liability to Braneff to $100,000. In addition, the two defendants' liability would be completely extinguished if Braneff's recovery against Mi–Jack exceeded $400,000. Braneff also agreed to indemnify SP and Case *from further liability*. By virtue of these terms, SP and Case acquired a financial interest in Braneff's recovery from Mi–Jack. However, Braneff states that there was no agreement that Southern Pacific or Case would cooperate with Braneff or "go easy on him" in the trial of the case. Nevertheless, based upon the terms of the agreement, the interests of the two settling defendants clearly were

1. The Honorable Arthur Dyess, former Justice, Court of Appeals, First District of Texas at Houston, sitting by assignment.

2. The settling defendants participated in all aspects of the trial including voir dire, cross-examination, and closing argument. However, they called no witnesses.

3. This so-called "Mary Carter Agreement" gets its name from *Booth v. Mary Carter Paint Co.,* 202 So.2d 8 (Fla.Dist.Ct.App.1967) and was coined in *Maule Industries, Inc. v. Rountree,* 264 So.2d 445, 446 (Fla.Dist.Ct.App.1972), *rev'd,* 284 So.2d 389 (Fla.1973).

contrary to those of Mi–Jack, the remaining defendant at trial.

The case was tried to a jury which unanimously found both Southern Pacific and Mi–Jack negligent, attributing 65 percent of the responsibility for Braneff's injuries to SP and 35 percent to Mi–Jack. The jury's $2,002,000 damage award was reduced by 65 percent, and judgment was entered against Mi–Jack on the jury's verdict for total damages in the amount of $700,700 plus prejudgment interest. Therefore, under the terms of the Mary Carter agreement, Southern Pacific's and Case's liability was extinguished, and Braneff would recover nothing from those defendants.

On appeal, Mi–Jack raises six points of error. First, Mi–Jack challenges the trial court's exclusion of all evidence of the Mary Carter agreement between Braneff and the settling defendants. (Point one.) Mi–Jack also challenges the trial court's decision permitting the settling defendants to participate at trial. (Point two.) Mi–Jack also attacks both the legal and factual sufficiency of the evidence to support the jury's failure to find that Braneff was contributorily negligent. (Points three and four.) In conjunction with this complaint, Mi–Jack contends that the trial court erred in its instruction to the jury concerning Braneff's failure to discover or guard against a product defect. (Point five.) Finally, Mi–Jack claims that the evidence was factually insufficient to support the jury's finding that Mi–Jack was negligent. (Point six.)

The threshold question presented is whether, under the circumstances that existed in this case, evidence of the Mary Carter agreement should have been admitted at trial even though Mi–Jack, the non settling defendant, was unable to demonstrate bias or prejudice on the part of any testifying witness that warranted impeachment. Because we conclude that the court's exclusion of the evidence was harmful error, we sustain Mi–Jack's first point of error and reverse and remand for a new trial.

When a settling defendant acquires, by way of a Mary Carter agreement, a financial interest in the plaintiff's recovery against a non settling defendant, the settling defendant is no longer aligned against the plaintiff in a traditional sense with the non settling defendant. The settling party has an obvious incentive to assist the plaintiff's case against the non settling defendant, because the Mary Carter agreement provides for a reduction of its own liability, depending on the size of the total verdict. The more successful the plaintiff is against the non settling defendant, the less the settling defendant will have to pay.

Courts have consistently presumed under these circumstances that the shift in the settling defendant's position in relation to the other parties will in some way alter the manner of his participation at trial. For example, even though a non settling defendant would be expected to point the finger at a co-defendant on the issue of liability, that same defendant, because of its own continuing potential liability, will also seek generally to *minimize the amount of the plaintiff's recovery*. On the other hand, it is highly likely that a Mary Carter defendant will seek to *increase the amount of the plaintiff's recovery* against the non settling defendant.

In its first point of error, Mi–Jack argues that the trial court committed reversible error in completely excluding evidence of the Mary Carter agreement. Mi–Jack contends that the agreement was admissible under TEX.R.CIV.EVID. 408 to show the bias, prejudice, or interest of SP and Case, and argues that the jury must have been confused by the settling defendants' "lack of zeal" in cross-examination and their "pattern of lackluster challenges" to Braneff's evidence. Further, according to Mi–Jack, the closing arguments by the lawyers for the settling defendants were necessarily misleading and dealt a "devastating blow" to the real defendant, Mi–Jack, because they urged the jury to believe Braneff's testimony and to sympathize with the extent of his injuries.[4] Mi–Jack contends the

---

4. In closing argument, counsel for Southern Pa-  cific stated: "That gets us to the negligence of

alleged error resulted in an improper verdict.

Braneff and Mi–Jack agree that under Texas law the jury may be entitled to know about the existence of a Mary Carter agreement. However, the parties are sharply divided on the proper method of admitting the evidence and the circumstances warranting its admission.

While Mi–Jack insists that admission is not so narrowly restricted, Braneff contends that evidence of a Mary Carter agreement is admissible only on cross-examination for purposes of impeachment of a witness shown to be biased by it. Therefore, according to Braneff, the trial court properly excluded the evidence in this case because Mi–Jack was unable to demonstrate bias on the part of any witness that would have warranted introduction of the evidence for impeachment.

Braneff points out specifically that Mi–Jack attempted to introduce the agreement in four instances, all of which allegedly were improper:

(1) During voir dire, Mi–Jack argued that the agreement could be disclosed upon a showing of anticipation that there *will be* bias or prejudice of witnesses during the trial.[5] Braneff argued that the agreement was not admissible during voir dire;[6] its admission would be proper only for purposes of impeachment if the settling defendants called witnesses to participate and assist Braneff in presenting his case or if Braneff called the settling defendants' witnesses.

(2) Outside the presence of the jury, Mi–Jack attempted to impeach Braneff's expert witness, Dr. Johnson, with the agreement. Mi–Jack was unable to establish that Dr. Johnson knew of the agreement or that his testimony was affected by it in any way.

(3) Even though Braneff did not testify about Mi–Jack on direct examination, Mi–Jack attempted to establish a basis for impeaching him with the agreement. Mi–Jack's bill of exceptions indicates that Braneff knew very little about the agreement ("I just know something about a hundred thousand dollars.") and understood even less ("I heard them talking, you know, some kind. That's all I know. If it had been discussed, I didn't understand it.").

(4) After SP's attorney made his closing argument, Mi–Jack again urged disclo-

---

Mi–Jack. That they failed to do something that they should have done. And it caused this accident that they failed to adequately train. And they contracted to do that. They said they'd do it. And they didn't. And as a result, a man, who I think is a very proud man, a man who I think is very sincere, who is a very credible man, who didn't come in here and try to tell you something that wasn't so, a man named Mr. Braneff, who now refers to his leg as a stump. And not a leg. And that carries with it a day in, day out, whether he's asleep or not, a situation of limitations, of impairment, of pain, of suffering, of mental anguish. And I would be less of a person if I were to stand here and tell you that that's not so. Because it is."

> Counsel for Case likewise argued: "Probably I ought to say some few words about damages. I can say to you that Mr. Braneff has touched me like very few people have touched me, and I've been here, Your Honor, almost 40 years, and seen all manners of plaintiffs and defendants, and he touched me because of his pride and his willingness to try to overcome the handicap. He was no crybaby. He says: 'I can make it. I'm not a cripple.' And he touched me. I understand the nature of his loss. In a way I feel it myself, because when

one of us suffers a grievous injury, we all hurt with him, don't we? And yet I'm not going to speak as to the amount of the damages. I'll tell you, quite frankly, the reason is I don't think it's my problem."

**5.** Specifically, Mi–Jack stated that it expected to impeach Joseph Wirkus, Case's corporate representative on the agreement. The trial court did not find the anticipation of such impeachment to warrant admission of the agreement. When the time came, rather than call the witness live, Mi–Jack presented Joseph Wirkus' videotaped deposition.

**6.** Braneff relies on *Clayton v. Volkswagenwerk A.G.*, 606 S.W.2d 15, 17 (Tex.Civ.App.—Houston [1st Dist.] 1980, writ ref'd n.r.e.), for this rule. However, we believe *Clayton* is distinguishable from the case before us. While the *Clayton* court acknowledged that Mary Carter agreements are generally admissible, it held that the agreement in that case should not have been admitted because the settling parties did not follow the Mary Carter pattern in carrying out their agreement. The settling defendant, although present at trial, did nothing to damage Volkswagen or to help Clayton recover. 606 S.W.2d at 18.

sure of the agreement, arguing that the tenor of SP's argument was calculated to increase the plaintiff's damages and, therefore, warranted informing the jury of the true alignment of the parties.

In each of these instances, according to Braneff, the trial court correctly refused to admit evidence of the agreement. Mi–Jack insists, on the other hand, that the refusal was reversible error. Resolution of this issue is controlled by the supreme court's holding in *General Motors Corp. v. Simmons*, 558 S.W.2d 855, 857 (Tex.1977), and the language and the intent of rule 408 of the Texas Rules of Civil Evidence.

The Admissibility of Mary Carter Agreements under *General Motors Corp. v. Simmons*

■ The Texas Supreme Court first addressed the question of admissibility of Mary Carter agreements in *General Motors Corp. v. Simmons*, 558 S.W.2d 855, 857 (Tex.1977), a case that predates the adoption of rule 408 by six years.

*Simmons* involved the first Mary Carter agreement to reach the Texas Supreme Court. In that case, Simmons was involved in a collision with a truck owned by Feld Leasing and operated by its employee, Johnston. Simmons was blinded by flying glass when his car window shattered on impact. He sued Feld and Johnston in negligence, and he sued General Motors Corporation in products liability, contending that the glass in his automobile was defective. The defendants filed cross-claims. Simmons then entered into a Mary Carter agreement with Feld and Johnston. Each of the settling defendants remained a party at trial.

During opening statement, on cross-examination, and in argument, GM sought to admit evidence of the nature of the agreement between Simmons and Feld and Johnston, but the trial court refused to permit the disclosure. However, the jury was told on several occasions that there was "no adversity or diversity of interest" between the plaintiff Simmons and the defendants Feld and Johnston. In fact, plaintiff's counsel informed the jury on voir dire, "This is a lawsuit against General Motors primarily, and only, as far as plaintiff is concerned. This is a suit seeking money damages ... against General Motors Corporation...." Much like counsel for Southern Pacific and Case, counsel for Feld and Johnston took an active part in the damages dispute, made an effort to establish that Simmons was totally blind, and attempted to evoke sympathy for him.

While acknowledging that the traditional rule in Texas is to exclude evidence of settlement agreements, the supreme court reversed the judgment based on the jury's verdict in favor of Simmons, holding that "[t]he financial interest of parties and witnesses in the success of a party is a proper subject of disclosure by direct evidence or cross-examination." *Simmons*, 558 S.W.2d at 857. Specifically, the interest of Feld and Johnston in Simmons' recovery from General Motors was "a proper subject of cross-examination and proof." 558 S.W.2d at 859.

Post–*Simmons* case law consistently supports the rule that evidence of a defendant's financial stake in the plaintiff's recovery resulting from a Mary Carter agreement is admissible before a jury when the settling defendant participates in the trial of the case. *See Scurlock Oil Co. v. Smithwick*, 724 S.W.2d 1, 4 (Tex.1986) (Mary Carter agreement from another trial involving other parties was not admissible; but, in this case, Scurlock [one defendant] was entitled to impeach Missouri Pacific's [the other defendant's] testifying principals or agents as to the guaranty to the Smithwicks [plaintiffs] if those persons sought to aid the Smithwicks' recovery.); *Webster v. Lipsey*, 787 S.W.2d 631, 638 (Tex.App.—Houston [14th Dist.] 1990, writ denied) (allowing Honda, the Mary Carter defendant, to participate at trial was not error when the jury was informed of the settlement agreement) *American Cyanamid Co. v. Frankson*, 732 S.W.2d 648, 654–55 (Tex.App.—Corpus Christi 1987, writ ref'd n.r.e.) (trial court did not err in reading portions of the Mary Carter agreement to the jury when the agreement was not reached until after the close of the evidence and before final argument; fur-

ther, there was no error in allowing a settling defendant to argue when the jury was aware at the time of argument that a settlement with that defendant had been reached).

Both Braneff and Mi–Jack focus on two particular phrases in the *Simmons* opinion: "disclosure by direct evidence or cross-examination" and "a proper subject of cross-examination and proof." Braneff contends that the court's intent in choosing this wording was to restrict the admissibility of Mary Carter agreements to impeachment of testifying witnesses only. Further, Braneff interprets the phrase "direct evidence" to mean only a *written settlement agreement* such as existed in the *Simmons* case. Braneff argues that because there was no written agreement in this case, there was no "direct evidence" to introduce. Braneff presents no authority for his interpretation, however, and we do not read *Simmons* so narrowly.

Whatever their exact intention in choosing the phrase "direct evidence," the *Simmons* court clearly intended that evidence of the agreement could be presented through impeachment by cross-examination *and/or* by other means ("cross-examination *and* proof" "direct evidence *or* cross-examination"). Had the court intended to limit the manner of admission to cross-examination alone, this additional language would not have been included. Further, the fact that cross-examination is but one method of proof leaves open the possibility of other means of admission. The term "direct" evidence, when juxtaposed with "cross-examination," suggests "direct" testimony as well as other "direct" evidence, such as a written agreement.

█ Likewise, the language of rule 408 supports our conclusion that the manner of admission of evidence of a Mary Carter agreement is not restricted to cross-examination of a biased witness.

TEX.R.CIV.EVID. 408

Rule 408 of the Texas Rules of Civil Evidence provides in relevant part:

Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount is not admissible to prove liability for, or invalidity of, the claim or its amount.... This rule ... does not require exclusion when the evidence is offered for another purpose, such as proving *bias or prejudice or interest of a witness or a party* ....

Focusing on the reference to bias or prejudice of a witness, Braneff argues that rule 408 restricts admission of Mary Carter agreements to impeachment of the credibility of a witness or evidence [7] offered by the settling defendants in support of the plaintiff's recovery. Mi–Jack contends that rule 408 allows evidence of the settlement to be admitted even though such evidence is not used to impeach the testimony of any witness or party. We agree.

Specifically, Mi–Jack focuses on the language in rule 408 that provides that settlement agreements are admissible to show the *interest* of a *party*. The corresponding federal rule, used as a model by the Texas drafters, provides in relevant part that evidence of a settlement agreement is admissible when offered to prove "bias or prejudice of a witness." The *federal rule* does not mention the "interest" of a "party." FED.R.EVID. 408. We agree that the variance between the Texas and federal rules is deliberate and, therefore, significant in relation to the issue before us. We also agree with Mi–Jack that the language of the rule does not support the restrictive interpretation given it by Braneff.

The addition of the words "interest" and "party" in the Texas rule increases the elements that may be proven from two to three (bias, prejudice, *and* interest) and negates the possibility of an otherwise implied restriction to impeachment. It also permits scrutiny of witnesses *or* parties, suggesting that bias or interest of a party who is not a witness (i.e., who does not

---

**7.** Of course, "evidence" would not include voir dire, opening statement, or final argument by counsel since statements by the parties' lawyers' are not evidence.

testify) may also be shown. In sum, the Texas rule's variance from the federal rule indicates an intent on the part of Texas drafters to broaden the application of the exception that allows admission of Mary Carter agreements.

Conclusion

The spirit behind the exception established in rule 408 and the long line of Mary Carter decisions is the same and involves the basic issues of honesty and fairness. Courts have opined that the purpose of disclosing Mary Carter agreements is to maintain the integrity of the adversarial process and to avoid subterfuge created by a false and misleading portrayal to the jury of the real interests of the parties and witnesses. *See Scurlock*, 724 S.W.2d at 8 (Spears J., concurring) (Mary Carter agreements tend to undermine the adversary nature and integrity of the proceedings against the remaining defendant); *City of Houston v. Sam P. Wallace & Co.*, 585 S.W.2d 669, 673–74 (Tex.1979) (Mary Carter agreements possess a basic vice: they present a false and misleading picture to the jury); *American Cyanamid*, 732 S.W.2d at 654 (the existence of Mary Carter agreements skews the presentation of the case to the jury); *Browning–Ferris, Inc. v. Mack Trucks, Inc.*, 714 S.W.2d 405, 407 (Tex.App.—Corpus Christi 1986, writ ref'd n.r.e.) (the problem with keeping Mary Carter settlements from the jury is that often the jury is tricked by the misalignment of the parties); *Clayton*, 606 S.W.2d at 18 (citing *Simmons*) (the gestures by counsel for the settling defendants were inexplicable in the eyes of the jury without knowledge of the Mary Carter agreement).

It is inconsistent with this purpose that a party be permitted to avoid disclosure of a Mary Carter agreement by strategic non-action, such as refusing to call a particular witness or witnesses, not vigorously cross-examining the plaintiff or his witnesses, and waiting, as did the Mary Carter defendants in this case, until final argument to manipulate the jury's sympathies in favor of the plaintiff through counsels' considerable advocacy skills.

Counsel for Southern Pacific stated the following in voir dire:

Those of us who try lawsuits have come to the conclusion over the years, and I know Judge West will echo this, as well as the lawyers, that juries, in their collective wisdom, in our instance 12 minds watching what's happened, listening to the testimony and understanding it, are very wise and very sharp and no matter what sleight of hand and smoke screens the lawyers may try, you can see through it. *Not that we would do something like that . . . .*

(Emphasis added.)

We do not believe that a duty must devolve on the jury to recognize and see through such "sleight of hand and smoke screens" as were created in this case. While performing the difficult job of sifting and weighing conflicting evidence and testimony, juries are at least entitled to expect and believe that the lawyers are who they say they are and represent whom they claim to represent. When a Mary Carter defendant participates in the trial of the case, informing the jury of the existence of the Mary Carter agreement is the only way to assure that the jury is informed of the true interests of the parties.

Because the Mary Carter defendants participated in the trial of this case, the existence of the Mary Carter agreement should have been revealed to the jury. The trial court erred in excluding this evidence.

Was the Error Harmful?

■ An appellate court reviews the admissibility of evidence as it would any question of law, by reviewing the legal basis for admissibility and then determining the correctness of the trial court's ruling. *See Southwestern Bell Tel. Co. v. Griffith*, 575 S.W.2d 92, 103 (Tex.App.—Corpus Christi 1978, writ ref'd n.r.e.). This Court may reverse a trial court's judgment on the basis of an erroneous evidentiary ruling only when a substantial right of the complaining party is affected. Tex.R.Civ. Evid. 103. Specifically, rule 103 provides as follows:

(a) Effect of erroneous ruling. Error may not be predicated upon a ruling

which admits or excludes evidence unless a substantial right of the party is affected....

*See also Singleton v. Terrel,* 727 S.W.2d 688, 690 (Tex.App.—Texarkana 1987, no writ); *Neily v. Aaron,* 724 S.W.2d 908, 912 (Tex.App.—Fort Worth 1987, no writ).

A party has no right more substantial than the right to trial by a jury that can fairly evaluate the evidence presented by all parties. By refusing to inform the jury of the true alignment of the parties in this case, the trial court denied Mi–Jack that right.

Accordingly, we sustain Mi–Jack's first point of error, reverse the judgment of the trial court, and remand this case for a new trial. Because our holding is dispositive of the appeal, we do not address Mi–Jack's remaining points of error.