**TEXAS CAPITAL SECURITIES, INC. and Butch Ballow, Appellants,**

v.

**J.D. SANDEFER, III and Stephen F. Smith, Appellees.**

No. 01–99–01238–CV.

Court of Appeals of Texas, Houston (1st Dist.).

May 17, 2001.

Opinion on Rehearing July 26, 2001.

Robert M. Roach, Jr., James D. Pierce, Houston, for appellant.

Patrick Zummo, Houston, for appellee.

Panel consists of Justices WILSON, NUCHIA, and DUGGAN.*

## OPINION

WILSON, Justice.

Butch Ballow, stock promoter, and Texas Capital Securities, Inc., brokerage firm, appeal the jury's finding that they made fraudulent misrepresentations to J.D. Sandefer, III and Stephen F. Smith, appellees. Ballow and Texas Capital were found jointly and severally liable for the $359,063 purchase price of the stock, and the jury awarded $8 million dollars in punitive damages against Ballow. We affirm.

## Background

Stephen N. Johnson, a stock broker with Texas Capital, met with Ballow to discuss Titan Resources, Inc. During the meeting, Johnson encouraged Ballow to invest $500,000 in Titan. Shortly thereafter, two companies with whom Ballow was associated made substantial investments in Titan.

Six months later, Johnson discussed Titan with Sandefer. Johnson told him he knew people close to the company, and Titan had an interest in property near Voisey Bay, a mineral estate in Canada.[1]

Sandefer was familiar with Voisey Bay, and he decided to invest $24,998 in Titan stock.

A couple of months later, Johnson informed Sandefer that Titan's stock price had risen from 83¢ a share to $3.50 a share. Johnson told Sandefer he expected Titan stock to reach $40 a share, and, as a result, Sandefer invested an additional $264,012. Sandefer introduced Smith, his business partner, to Johnson. After talking with Johnson, Smith invested $70,053 in Titan.

Titan's stock plummeted, and Sandefer and Smith asked Johnson to schedule a meeting between them and Ballow, Johnson's contact at Titan. After the meeting, Sandefer and Smith testified they felt Ballow was not their "kind of guy." Johnson told Sandefer he believed Ballow had defrauded them.

Sandefer and Smith brought suit against Ballow, Johnson, Titan, and Texas Capital for common law and statutory fraud, alleging they knowingly and recklessly made false and material misrepresentations intended to be communicated to them. They alleged violations of the Texas Securities Act, and sued for exemplary damages.

Sandefer and Smith propounded requests for admissions on Ballow who was representing himself pro se. The requests were not answered timely and were deemed against him. Ballow retained an attorney and filed a motion to withdraw the deemed admissions, and he submitted an affidavit stating he never received the requests. The trial court denied the motion to withdraw. Ballow refused to an-

---

* The Honorable Lee Duggan, Jr., retired Justice, Court of Appeals, First District of Texas at Houston, participating by assignment.

1. The Voisey Bay region was allegedly a region where a nickel-copper-cobalt discovery had been made in early 1995.

swer any questions during his deposition, invoking the Fifth Amendment.

Johnson and Titan settled with the appellees before trial, in the form of agreed judgments, and they were not submitted as parties in the jury charge.[2] Ballow and Texas Capital contend that Johnson's settlement agreement was in fact a Mary Carter agreement.

The jury found Ballow and Texas Capital defrauded Sandefer and Smith. The trial court accepted the jury's findings as to common law fraud and exemplary damages against Ballow. Sandefer and Smith elected to recover against Texas Capital on the jury finding that it violated the Texas Securities Act (the Act). The purchases of Titan stock were rescinded, and each of the four defendants was held jointly and severally liable for the $359,063.25 rescission, equal to the purchase price of the stock. The appellees were awarded $8,000,000 in punitive damages against Ballow. Ballow and Texas Capital appeal the award.

## I. Ballow's Appeal

### A. Johnson's Mary Carter Agreement

In Ballow's point of error 1 and Texas Capital's point of error 11, they argue the trial court committed reversible error by excluding evidence of Johnson's Mary Carter agreement and by refusing to exclude Johnson's testimony.

Johnson and the appellees entered into an agreement that stated in substance:
- the appellees agreed not to file any other claims against Johnson;
- no abstract of judgment would be filed against Johnson;
- the appellees agreed to exhaust their remedies against every other person

against whom they had asserted a claim;
- the appellees agreed not to file a proof of claim or equity in any potential bankruptcy Johnson may file; and
- in return, Johnson agreed to pay $359,063

This agreement was incorporated in the agreed putative final judgment and signed by the trial court two weeks before trial. Ballow and Texas Capital argue this was a Mary Carter agreement, and the jury should have been informed of its existence.

■■■ When a Mary Carter defendant participates in the trial of a case, informing the jury of the existence of the Mary Carter agreement is the only way to assure the jury is informed of the true interest of the parties. *Mi–Jack Products, Inc. v. Braneff,* 827 S.W.2d 493, 499 (Tex.App.—Houston [1st Dist.] 1992, no writ). In *Mi–Jack,* we held that failure to admit evidence of a Mary Carter agreement is reversible error, because the non-settling party is denied the right to a trial by a jury that can fairly evaluate the evidence presented by the parties. *Id.* at 500.

Appellees argue (1) their agreement with Johnson was not a Mary Carter agreement, (2) if the agreement was a Mary Carter agreement, Ballow did not seek the proper remedy, and (3) even if the agreement was a Mary Carter agreement, it was properly disclosed to the jury. We disagree.

■■■ The Texas Supreme Court has held a Mary Carter agreement exists when the plaintiff enters into a settlement with one defendant and goes to trial against the remaining defendant, and the settling defendant, who remains a party, guarantees the plaintiff a minimum payment, which

**2.** After the jury trial, the trial court vacated the agreed final judgments for Titan and Johnson and consolidated them with the final judgment for Ballow and Texas Capital.

may be offset in whole or in part by an excess judgment recovered at trial. *Elbaor v. Smith,* 845 S.W.2d 240, 247 (Tex. 1992).

### 1. Financial Incentive

■ Appellees first argue the settlement with Johnson was not a Mary Carter agreement because Johnson received no financial interest in appellees' recovery. Under this agreement, Johnson was liable for up to $359,063.25. Additionally, appellees requested Johnson be held jointly and severally liable with the non-settling defendants. Any recovery from Ballow or Texas Capital would therefore reduce the amount for which Johnson was responsible.

A Mary Carter agreement exists when the settling defendant guarantees the plaintiff a minimum payment which may be offset in whole or in part by an excess judgment recovered at trial. *Id.* Johnson guaranteed appellees a minimum payment of $359,063.25, which would be reduced by a finding in favor of appellees against any of the other defendants. Johnson effectively reduced his potential liability to one-fourth of $359,063.25 because Johnson was held jointly and severally liable with Ballow, Texas Capital, and Titan.[3] There can be no doubt Johnson obtained a financial stake in the outcome of this case.

### 2. Party Defendant

■ Appellees next argue Johnson was not a party to this action because, after the Mary Carter agreement was approved, he was in effect dismissed with prejudice. As indicated above, appellees specifically requested that Johnson be liable, in the final judgment of this action, jointly and severally with the other named defendants. In fact, appellees' attorney admitted appellees intentionally did not sever Johnson's settlement from the actions against Ballow and Texas Capital. As a result, Johnson remained a named defendant throughout this action.

By deferring judgment against Johnson, appellees effectively removed him from the trial, and, for the purposes of the Mary Carter agreement, Johnson was no longer a party. Johnson was then free to testify against the remaining defendants as a non-party witness. *Elbaor* at 248. At the same time, appellees requested Johnson be held jointly and severally liable in the final judgment. When the jury returned a verdict in favor of appellees, this Mary Carter agreement was vacated, as plaintiffs' counsel requested, and Johnson was again a party to this litigation. Johnson's agreement, while procedurally sound, clearly violates the spirit if not the letter of the law. It was error not to have instructed the jury on the existence of Johnson's Mary Carter agreement.

### 3. Harm Analysis

For the exclusion of evidence to constitute reversible error, the appellant must show the trial court committed error and the error (1) probably caused the rendition of an improper judgment; or (2) probably prevented the appellant from properly presenting the case to the court of appeals. Tex.R.App. P. 44.1.

■ Johnson's videotaped deposition was played for the jury. During the deposition, Ballow's attorney questioned Johnson, and Johnson testified he had entered into a settlement agreement with appellees. In addition, Patrick Zummo, appellees' attorney, testified about attorney's fees. During that testimony, Ballow's attorney asked Zummo if appellees had settled with Titan and Johnson. Zummo testified they had agreed to a judgment.

---

3. Titan also had an agreed settlement with appellees, and it is not a party to this appeal.

Smith testified that Johnson and Titan had settled. Furthermore, Smith testified Johnson cooperated with appellees by meeting with their attorneys and helping them prepare a chronology in the case. Sandefer testified that he, Johnson, and Zummo met at Sandefer's house to discuss filing suit. Because the jury was made aware of the settlement agreements and the relationship between Johnson and appellees, we hold the error was harmless.[4]

### 4. Exclusion of Johnson's Testimony

■■■ Ballow argues the trial court erred by not excluding Johnson's testimony, given the fact he had entered into a Mary Carter agreement. Despite filing a written pretrial motion objecting to Johnson's testimony, neither defendant objected to Johnson's testimony during trial. A motion in limine does not preserve a complaint for appellate review. *Hartford Accident & Indemn. Co. v. McCardell*, 369 S.W.2d 331, 335 (Tex.1963).

■■■ In order to preserve the right to complain about an adverse ruling on appeal, a timely objection must be made when the evidence is offered. *Sims v. State*, 816 S.W.2d 502, 504 (Tex.App.—Houston [1st Dist.] 1991, writ denied). Any error is waived as nothing is preserved for review. Tex.R.App. P. 33.1.

We overrule Ballow's point of error 1 and Texas Capital's point of error 11.

### B. Deemed Admissions

■■■ In Ballow's point of error two, he argues the trial court committed reversible error by denying his motion to withdraw admissions even though he had not seen the requests and had not been represented by counsel when they were deemed admitted.

Appellees propounded 30 requests for admissions on Ballow. By not timely responding to the request, Ballow "admitted," among other things,

- he was an employee, agent, and officer of Titan in 1996 and 1997;

- Titan had an agreement with Texas Capital and Johnson that they would be paid an amount in excess of their normal brokerage commissions if their sales of Titan stock reached certain targets;

- he asked Johnson and Texas Capital to communicate Titan's business plans to appellees;

- Titan never held any mining interest in the Voisey Bay region of Canada;

- Titan misrepresented its acquisition prospects to appellees, but not to Texas Capital or Johnson;

- he represented to appellees that Titan was seeking a NASDAQ listing, and they made no such application.

■■■ The trial court has broad discretion to permit or deny the withdrawal of deemed admissions. *Stelly v. Papania*, 927 S.W.2d 620, 622 (Tex.1996). An abuse of discretion occurs when a court acts without reference to guiding rules or principles, or acts arbitrarily or unreasonably. *Id.* A party may withdraw deemed admissions upon a showing of good cause if the trial court finds the parties relying upon the responses would not be unduly prejudiced and the presentation of the merits of the action will be subserved thereby. *Morgan v. Timmers Chevrolet, Inc.*, 1

---

4. The trial court sustained objections to the inclusion of specific terms of the settlement agreement. The specific terms were presented by way of bill of exception. The bill, however, does not prove Ballow or Texas Capital was harmed by the exclusion of the testimony. As a matter of fact, in the bill, Johnson testified he was not "supposed to cooperate with [appellees] by giving [his] testimony at trial, et cetera."

S.W.3d 803, 807–808 (Tex.App.—Houston [1st Dist.] 1999, pet. denied).

In *Barker v. Harrison,* 752 S.W.2d 154 (Tex.App.—Houston [1st Dist.] 1988, writ denied), we addressed the issue of withdrawal of deemed admissions. We denied Barker's request to withdraw his deemed admissions, because his attorney never filed a motion requesting that he be allowed to file late answers. *Id.* at 155. Such was not the case here. Ballow hired an attorney, and his attorney filed a motion to withdraw the deemed admissions a month later. Appellees would have had nine months to conduct discovery had the trial court granted Ballow's motion.

Ballow submitted an affidavit stating the requests for admissions were mailed to an incorrect address. When compelling Ballow to respond to interrogatories and requests for production, the trial court found Ballow "had mislead the Court by giving a wrong address," and that Ballow "should not be rewarded for concealing his correct address or for refusing to cooperate in bringing the case to conclusion by orderly and timely progression of pretrial matters." Furthermore, before the trial began, the trial court reiterated its ruling when it stated on the record, "I think the Court's ruling was that it wasn't any mistake or inadvertence on his part, he just refused to answer them." Ballow failed to show good cause for not answering the requests for admissions; therefore, we need not determine if he satisfied the other requirements necessary to warrant a withdrawal. *See Morgan,* 1 S.W.3d at 807–808.

The trial court did not abuse its discretion when it refused to allow Ballow to withdraw his deemed admissions.

We overrule Ballow's point of error two.

## C. Ballow's Fraud

In Ballow's point of error three, he argues the trial court erred by entering judgment on the fraud claims against him because there was no evidence or, alternatively, factually insufficient evidence that appellees relied on any material misrepresentation or omission made by him.

To prove common law fraud, appellees had to establish (1) Ballow made a material representation; (2) the misrepresentation was made with knowledge of its falsity or made recklessly without any knowledge of the truth and as a positive assertion; (3) the misrepresentation was made with the intention that it should be acted on by the other party; and (4) the other party acted in reliance on the misrepresentation and thereby suffered injury. *T.O. Stanley Boot Co. v. Bank of El Paso,* 847 S.W.2d 218, 222 (Tex.1992); *Johnson & Higgins v. Kenneco Energy, Inc.,* 962 S.W.2d 507, 524 (Tex.1998). Ballow essentially attacks the third element of common law fraud—the misrepresentation was made with the intention that is should be acted on by the other party. *See Johnson & Higgins,* 962 S.W.2d at 524.

In conducting a no-evidence review, we consider all the evidence in the light most favorable to the prevailing party and indulge every reasonable inference in that party's favor. *Associated Indem. Corp. v. CAT Contracting, Inc.,* 964 S.W.2d 276, 285–86 (Tex.1998). If there is any evidence of probative force, i.e., more than a mere scintilla, to support the findings, we will overrule the point. *Vannerson v. Vannerson,* 857 S.W.2d 659, 666 (Tex.App.—Houston [1st Dist.] 1993, writ denied).

In reviewing a challenge to the factual sufficiency of the evidence, we consider, weigh, and examine all of the evidence that supports and is contrary to the

finding. *Id.* We will set aside the finding only if the evidence, standing alone, is so weak, or the finding so against the great weight and preponderance of the evidence, that the finding is manifestly erroneous or unjust. *Id.*

 In Ballow's deemed admissions, he "admitted" he asked Johnson to communicate Titan's business plans to appellees. He also "admitted" Titan misrepresented its acquisition prospects. The admissions established the misrepresentation, but we must determine if appellees relied on these statements.

Appellees both testified they had made stock purchases in the past and were familiar with the risks associated with such investments. Neither did any research on his own to investigate Titan, Johnson, or Ballow. They testified the broker is responsible for performing the due diligence to investigate the purchase, and it is the buyer's responsibility to align himself with a broker he trusts. Sandefer and Smith believed they had done so when they purchased from Johnson.

While it is true appellees had not met Ballow before the purchases were made, Johnson prefaced much of his information relayed to appellees with references to information he received from Ballow. Sandefer's and Smith's actions were predicated on the information Johnson gave them which he conveyed from Ballow. The information seemed more credible and reliable because it was communicated by one of Titan's officers.

Ballow contends there can be no fraud if Sandefer and Smith did not rely on representations he made directly to them. Ballow argues that, absent privity, there can be no fraudulent misrepresentation, and he relies on *Kanon v. Methodist Hosp.,* 9 S.W.3d 365 (Tex.App.—Houston [14th Dist.] 1999, no pet.) to support his argument.

In *Kanon,* the plaintiff brought fraud claims against the Methodist Hospital after Kanon suffered complications following a TMJ implant operation. *Id.* at 367. Kanon alleged Methodist made affirmative misrepresentations to the medical community, including Kanon's oral surgeon, about the adequacy of testing on the implanted device. *Id.* at 372. The Fourteenth Court of Appeals held Methodist could not be held liable for intentional misrepresentation, because it was not in privity with Kanon. *Id.* For the misrepresentation to be actionable, the maker must intend to influence the very person to whom he makes the representation. *Id.* Methodist intended to influence the medical community, not Kanon. Here, however, Ballow's actions were intended to influence appellees.

 The Texas Supreme Court held in 1890 that "it is sound doctrine that a third person, to whom they were not directly made, can maintain an action of deceit ... if it appear[s] that the defendant's false representations were made with a direct intent that he should act upon them in the manner which occasioned the injury." *Gainesville Nat'l Bank v. Bamberger,* 77 Tex. 48, 13 S.W. 959, 960–61 (1890). Furthermore, the Restatement (Second) of Torts addresses the issue of misrepresentations to third parties. The general rule in section 531 states:

> One who makes a fraudulent misrepresentation is subject to liability to the persons or class of persons whom he intends or has reason to expect to act or to refrain from action in reliance upon the misrepresentation, for pecuniary loss suffered by them through their justifiable reliance in the type of transaction in which he intends or has reason to expect their conduct to be influenced.

RESTATEMENT (SECOND) OF TORTS § 531 (1976).

Appellees' "reliance" argument pertains to pre-purchase and post-purchase reliance. Sandefer testified he did not sell the stock when it started its descent because Johnson assured him Ballow said there was just a delay in obtaining an audit on a company Titan intended to acquire. Sandefer confronted Johnson about the stock's decline, and Johnson did not recommend selling the Titan stock. In fact, Johnson appeared "upbeat," and because Johnson was talking with Ballow, Sandefer was comforted. Sandefer and Smith called Johnson once or twice a week after the initial price reduction. Johnson continued to assure them there were *temporary* setbacks. Johnson was quoting Ballow who told him these were only temporary delays.

During this time period, Sandefer saw an article in THE HOUSTON CHRONICLE that said Titan bought a gravel pit. Sandefer and Smith were encouraged by this news, because this was a purchase Johnson had predicted would occur. Johnson showed appellees several press releases and a press release kit. Sandefer testified there was no truth in the press releases.

In his deposition, Ballow was specifically asked if he made misrepresentations to Johnson that he intended to be relayed to Johnson's customers so they would purchase Titan stock. Instead of denying these claims, Ballow asserted the privilege against self incrimination. The jury was entitled to make a negative inference from Ballow's refusal to answer. *See Baxter v. Palmigiano,* 425 U.S. 308, 318, 96 S.Ct. 1551, 1558, 47 L.Ed.2d 810 (1976); *Texas Dep't of Public Safety Officers Ass'n v. Denton,* 897 S.W.2d 757, 763 (Tex.1995).

The evidence was legally and factually sufficient to support the jury's finding that Ballow committed fraud.

We overrule Ballow's point of error three.

## D. Rescission

In Ballow's point of error four, he argues the trial court erred by entering judgment for rescission because there was no evidence or, alternatively, factually insufficient evidence to support the award of rescission.

The jury found Ballow committed common law fraud against appellees, and appellees elected a judgment against Ballow solely for rescission. As part of the rescission, appellees tendered their Titan stock to the trial court, and Ballow was held jointly and severally liable for $359,000, the price appellees paid for their Titan stock. No actual damages were found by the jury or awarded against Ballow in the judgment.

Ballow argues rescission requires privity of contract, and rescission against a nonparty to the contract would be fundamentally inconsistent with the very concept of rescission. Ballow simply argues it is unfair to make him buy back the stock from appellees because he did not sell it to them.

Despite Ballow's assertions, rescission has long been a remedy for common law fraud. *Adickes v. Andreoli,* 600 S.W.2d 939, 945–47 (Tex.Civ.App.—Houston [1st Dist.] 1980, writ dism'd).

The jury found Ballow offered or sold a security to appellees. Ballow contends neither he nor Titan sold stock in Titan to appellees. When Sandefer was asked if Ballow sold him the Titan stock, Sandefer replied, "He did not *directly* sell me this stock." (Emphasis added.) Sandefer was then asked if he relied on anything Ballow said to him before he purchased the stock. Again, Sandefer's response was, "That he

said *directly* to me?" Ballow did not sell the stocks directly to the buyers, but remained insulated by the brokers. This does not, however, mean he cannot be held accountable in rescission upon findings of fraudulent misrepresentations through a broker. *See Shatterproof Glass Corp. v. James,* 466 S.W.2d 873, 876–77 (Tex.Civ. App.—Fort Worth 1971, writ ref'd n.r.e.) (the courts have replaced "privity" and "primary benefit" with the concepts of "good faith" and "common honesty").

The decision to grant an equitable remedy such as rescission is within the discretion of the trial court. *Schenck v. Ebby Halliday Real Estate, Inc.,* 803 S.W.2d 361, 366 (Tex.App.—Fort Worth, 1990, no writ). The trial court did not abuse its discretion when it held Ballow responsible and required him to return appellees to the status quo.

We overrule Ballow's point of error four.

### E. Ballow's Punitive Damages

In Ballow's point of error five, he argues the trial court erred by entering judgment for punitive damages against him because there was no evidence, or alternatively factually insufficient evidence, that appellees suffered actual damages.

A plaintiff may also be entitled to punitive damages if it is entitled to rescission involving the return of property. *Nabours v. Longview Savings & Loan Ass'n,* 700 S.W.2d 901, 904–05 (Tex.1985). The consideration paid as a result of fraud constitutes actual damages and will serve as the basis for the recovery of exemplary damages. *International Bankers Life Ins. Co. v. Holloway,* 368 S.W.2d 567, 568 (Tex. 1963).

The award of punitive damages was legally proper.

We overrule Ballow's point of error five.

### F. Bifurcation

In Ballow's point of error 6 and Texas Capital's point of error 12, they argue the trial court erred by failing to bifurcate the trial.

The Texas Supreme Court has adopted the requirement of bifurcated trials in punitive damage cases. *Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10, 30 (Tex.1994). If presented with a timely motion, the trial court should bifurcate. "[H]ighlighting the relative wealth of the defendant has a very real potential for prejudicing the jury's determination of other disputed issues...." *Id.*

Here, the trial court granted the motion to bifurcate, but, at the close of appellees's case, appellees announced they did not intend to introduce any evidence regarding Ballow's or Texas Capital's net worth. As a result, there was nothing to bifurcate. Additionally, as to Texas Capital, appellees elected to recover from the jury's findings under the Texas Securities Act rather than common law fraud. Because no punitive damages were awarded in the judgment, there is no harm to Texas Capital.

With Ballow, however, the jury was presented evidence that Ballow made several million dollars from his investment in Titan. The jury returned a verdict for punitive damages against Ballow for $8,000,000. There was no evidence of Ballow's net worth, only evidence of his return on his investments in Titan. In *Uniroyal Goodrich Tire Co. v. Martinez,* 977 S.W.2d 328 (Tex.1998), the defendant presented a timely motion to bifurcate the issue of the amount of punitive damages. The trial court denied the motion, and the Texas Supreme Court held that this was harmless error, because no evidence of net worth was admitted. *Id.* at 342–43.

We overrule Ballow's point of error 6 and Texas Capital's point of error 12.

## II. Texas Capital's Appeal

In 12 points of error, Texas Capital appeals the judgment against it in the trial court.[5]

### A. Texas Securities Act

#### 1. Judgment Proper Under the Act

In Texas Capital's points of error one and two, it argues the trial court erred in awarding judgment against it under the Texas Securities Act (the Act) because the Act does not apply to purchases of securities sold in public secondary markets and it did not "offer or sell" a security.

As used in the Texas Securities Act, the terms "sale" and "offer for sale" or "sell" shall include every disposition, or attempt to dispose of a security for value. TEX. REV.CIV. STAT. ANN. art. 581–4(E) (Vernon Supp.2001). The term "sell" means any act by which a sale is made, and the term "sale" or "offer for sale" shall include subscription, an option for sale, a solicitation of sale, a solicitation of an offer to buy, an attempt to sell, or an offer to sell, directly or by an agent or salesman, by circular, letter, or advertisement or otherwise. *Id.* The terms "security" or "securities" include stock. TEX.REV.CIV. STAT. ANN. art. 581–4(A) (Vernon Supp.2001).

Article 581–33(A)(2) was copied almost verbatim from 15 U.S.C.A. § 77l(2). *Flowers v. Dempsey–Tegeler & Co.*, 472 S.W.2d 112, 114 (Tex.1971); *Anheuser–Busch Cos. v. Summit Coffee Co.*, 934 S.W.2d 705, 708 (Tex.App.—Dallas 1996, writ dism'd). Article 581–33(A)(2), however, differs from its federal counterpart in that it does not contain the phrase of limitation "by means of a prospectus or oral communication." The language used in the Texas Securities Act is broader than that used in its federal counterpart. *Anheuser–Busch*, 934 S.W.2d at 708.

Had the Texas Legislature intended to limit the scope of article 581–33(A)(2), it could have used limiting language, as did Congress. *Id.* Instead, it broadly defined the terms "sale," "sell," and "security." Further, because article 581–33 is remedial in nature in the civil context, it "should be given the widest possible scope." *Flowers*, 472 S.W.2d at 115; *Anheuser–Busch*, 934 S.W.2d at 708.

■ We are to construe the Texas Securities Act "to protect investors." TEX. REV.CIV. STAT. ANN. art. 581–10–1(b) (Vernon Supp.2001). Given the definitions the legislature gave the relevant terms, the purposes of the Texas Securities Act, and the language of article 581–33(A)(2), we conclude article 581–33(A)(2) applies to private, secondary securities transactions. *Anheuser–Busch*, 934 S.W.2d at 708.

■ Texas Capital next argues appellees did not buy Titan from it; they bought the stock in the public market. Appellees, however, contend they dealt directly with Texas Capital and were therefore in privity.

■ The Texas Securities Act applies to persons and corporations who offer or sell unregistered securities. *Flowers*, 472 S.W.2d at 115. Johnson testified it was his job to buy and sell securities. The Act applies if the seller is any link in the chain of the selling process. *Rio Grande Oil Co. v. State*, 539 S.W.2d 917, 922 (Tex.Civ. App.—Houston [1st Dist.] 1976, writ ref'd n.r.e.).

The trial court did not err when it found the Act applied to purchases of securities

---

5. We have already addressed Texas Capital's points of error 11 and 12.

sold in public secondary markets and Texas Capital offered and sold securities.

We overrule Texas Capital's points of error one and two.

### 2. Damages

■ In Texas Capital's point of error three, it argues the trial court erred in entering judgment on appellees' claims under the Act because appellees did not submit a damage issue.

The remedies available to a purchaser in an action under article 581–33 depend on whether the purchaser still owns the securities at issue. The person buying the security "may sue either at law or in equity for rescission or for damages if the buyer no longer owns the security." Tex. Rev.Civ. Stat. Ann. art. 581–33A(1) and (2); *See Summers v. WellTech, Inc.*, 935 S.W.2d 228, 232–33 (Tex.App.—Houston [1st Dist.] 1996, no writ). We have held a plaintiff who still owns the securities in question is only entitled to rescission. *Summers*, 935 S.W.2d at 231. Rescission is intended to restore plaintiffs to their original position. *Id.* at 232–33. A finding of actual damages is not required for equitable rescission.

We overrule Texas Capital's point of error three.

### 3. Sufficiency: Untruths or Omissions

In Texas Capital's point of error five, it argues the trial court erred in entering judgment on appellees' claims under the Act because there was no evidence or, alternatively, factually insufficient evidence to support the jury's finding that it was liable for untruths or omissions under the Act.

■ To recover under the Act, a plaintiff must prove a security was sold by means of (1) an untrue statement of material fact or (2) an omission to state a material fact that is necessary to make the statement not misleading. Tex.Rev.Civ. Stat. Ann. art. 581–33A(2). An omission or misrepresentation is material

> ... if there is a substantial likelihood that a reasonable investor would consider it important in deciding to invest. An investor is not required to prove that he would have acted differently but for the omission or misrepresentation.... [T]he focus under the Texas Securities Act is on the conduct of the seller or issuer of securities, i.e., whether they made a material misrepresentation, not on the conduct of individual buyers.

*Weatherly v. Deloitte & Touche*, 905 S.W.2d 642, 649–50 (Tex.App.—Houston [14th Dist.] 1995, writ dism'd w.o.j.).

■ Sandefer and Johnson were long-time social friends. Appellees testified Johnson did not tell them anything untrue during the conversations leading up to the Titan purchases. Johnson told them he thought the price was going to go up; he was told the company had few assets, but it was in the process of purchasing several unspecified acquisitions; he knew the principals; and he thought the shares would be listed on the NASDAQ.

■ Statements of opinion, including opinions regarding value are generally not actionable under the Act. *Paull v. Capital Resource Management*, 987 S.W.2d 214, 218–19 (Tex.App.—Austin 1999, writ denied). Johnson's comments amounted to nothing more than puffing or dealers' talk. As such, they do not amount to actionable misrepresentation. *See id.* at 219.

Appellees did not contend in answers to interrogatories that Texas Capital did anything that constituted an omission. Johnson, however, knew Titan had abandoned its Voisey Bay plans, but he did not tell appellees. Johnson admitted the state-

ments he made to appellees about Titan's financing were not true at the time, but he did not know it. Johnson did not tell appellees the Titan stock was not registered or that it was classified as "penny" stock.

Appellees argue much of Johnson's misconduct would have been prevented had Texas Capital enforced its written supervisory procedures. Johnson's supervisor at Texas Capital was supposed to review his accounts for "unauthorized trading" and "undue concentrations in a single security." Johnson's clients owned 1,275,051 shares of Titan's stock.

Johnson predicted the price of Titan stock would reach as high as $40 a share. This statement was made despite the Texas Capital supervisory procedure which prohibits prediction of price and performance.

There is a substantial likelihood a reasonable investor would consider the classification of Titan stock as well as its registration status important in deciding to invest. *See Weatherly*, 905 S.W.2d at 649–50. As such, we find there was legally and factually sufficient evidence to support the jury's finding.

We overrule Texas Capital's point of error five.

## B. Texas Capital's Fraud

### 1. Damages

In Texas Capital's point of error four, it argues the trial court erred in entering judgment on appellees' fraud claim because appellees did not to submit a damage issue.

Because appellees elected recovery under the Act, rather than common law fraud, it is not necessary for us to reach this point of error. *See Smith v. National Resort Communities, Inc.*, 585 S.W.2d 655,

660 (Tex.1979); *Adickes*, 600 S.W.2d at 946.

We overrule Texas Capital's point of error four.

### 2. Fraud

In Texas Capital's point of error six, it argues the trial court erred in entering judgment on appellees' common law fraud claims because there was no evidence or, alternatively, factually insufficient evidence to support the jury's finding of fraud.

Because appellees elected recovery under the Act, rather than common law fraud, it is not necessary for us to reach this point of error. *See Smith*, 585 S.W.2d at 660; *Adickes*, 600 S.W.2d at 946.

We overrule Texas Capital's point of error six.

## C. Exemption from Registration

### 1. Submission

■ In Texas Capital's point of error seven, it argues the trial court erred in not submitting its requested issue concerning exemption from registration.

It is undisputed the Titan stock sold to appellees by Texas Capital was not registered. Texas Capital argues the stock was exempt from registration, and the trial court erred in not permitting a trial amendment to Texas Capital's answer raising an exemption.

The anti-fraud provision of the Act states that "a person who offers or sells a security" in violation of section 7 of the Act "is liable to the person buying the security." TEX.REV.CIV. STAT. ANN. art. 581–33A(1) (Vernon Supp.2001). Section 7 prohibits the sale of unregistered securities. TEX.REV.CIV. STAT. ANN. art. 581–7A(1) (Vernon Supp.2001).

■ The burden of establishing any exemption for registration is on the person

claiming the exemption. *Prokop v. Krenek*, 374 S.W.2d 265, 267 (Tex.Civ.App.— Austin 1964, writ ref'd n.r.e.). Texas Capital filed a general denial.

For an issue to be submitted to the jury, Texas Rule of Civil Procedure 278 requires the issue to be raised by the pleadings. The rule further states: "... a party shall not be entitled to any submission of any question raised only by a general denial and not raised by affirmative written pleading by that party." TEX.R. CIV. P. 278. Texas Capital waived this argument by failing to specifically plead this affirmative defense.

We overrule Texas Capital's point of error seven.

### 2. Exclusion of Johnson's Testimony

■ In Texas Capital's point of error eight, it argues the trial court abused its discretion in excluding Johnson's registration exemption testimony as presented in Texas Capital's bill of exception.

During the bill of exception, Texas Capital attempted to introduce an exhibit Johnson identified as a summary of the highlights of Titan. Johnson testified a page in the exhibit was titled "manual exemption," and Johnson did not know if the document was from Moody's or Standard and Poor's.

Texas Rule of Evidence 103(a)(2) requires that, when the trial court excludes evidence, the substance of the evidence must be known to the court by offer, unless it is apparent from the context within which questions were asked. TEX.R. EVID. 103(a)(2). Johnson's testimony in the bill of exception was insufficient to satisfy this burden.

To prove an exemption, article 581–5(O)(9) requires that the following information appear in a recognized securities manual: [6]

> (a) A statement of the issuer's principal business;
>
> (b) A balance sheet as of a date within eighteen (18) months of the date of such sale; and
>
> (c) Profit and loss statements and a record of the dividends paid, if any, for a period of not less than three (3) years prior to the date of such balance sheet or for the period of existence of the issuer, if such period of existence is less than three (3) years.

TEX.REV.CIV. STAT. ANN. art. 581–5(O)(9). The balance sheet Texas Capital introduced during the bill of exception was dated February 28, 1994. The two sales in question took place in February and May of 1996, more than 18 months later. The only profit and loss statements for Titan that Texas Capital furnished were published in 1993, a period less than three years before the balance sheet. There were no profit and loss statements introduced reflecting the statistics for the 1992 and 1991, as required by article 581–5(O)(9).

In its bill, Texas Capital did not identify the source of the document introduced by Johnson, and it did not prove it came from a "nationally distributed manual of securities that is approved for use hereunder by the Board." The Act requires such proof.

The trial court did not abuse its discretion when it refused to allow Johnson's exemption testimony.

We overrule Texas Capital's point of error eight.

### 3. Trial Amendment

■ In Texas Capital's point of error nine, it argues the trial court abused its

---

**6.** The Act defines "recognized securities manual" as a nationally distributed manual of securities that is approved for use by the Board. TEX REV.CIV. STAT. ANN. art. 581–5(O)(9).

discretion in not permitting it to make a trial amendment to raise an exception to registration.

■ A request for a trial amendment should be granted unless the opposing party presents evidence of surprise or prejudice, or the amendment asserts a new cause of action or defense and thus is prejudicial on its face. *State Bar of Texas v. Kilpatrick*, 874 S.W.2d 656, 658 (Tex. 1994). Texas Capital's manual exemption affirmative defense was new and, thus, prejudicial on its face. *See Taiwan Shrimp Farm Village Ass'n v. U.S.A. Shrimp Farm Dev., Inc.*, 915 S.W.2d 61, 70 (Tex.App.—Corpus Christi 1996, writ denied).

Additionally, appellees contend they were surprised by the trial amendment because the Act includes more than 19 exempt transactions and six types of exempt securities. Tex.Rev.Civ. Stat. Ann. arts. 581–5(A)–(S), 581–6 (Vernon Supp. 2001). Because appellees were not required to negate any of these exemptions, it would have unfairly prejudiced them if the trial court had allowed Texas Capital to introduce an exemption for the first time during the trial. We find the trial court did not abuse its discretion when it refused to allow Texas Capital's trial amendment.

We overrule Texas Capital's point of error nine.

## D. Ballow's Video Testimony

### 1. Admission

■ In Texas Capital's point of error 10, it argues the trial court abused its discretion in admitting the video testimony of Ballow in which he repeatedly took the Fifth Amendment. It contends the testimony should have been excluded under Texas Rule of Evidence 403.

Appellees showed the videotaped deposition of Ballow during which he refused to answer on the grounds his answers may incriminate him. The 30–minute video showed Ballow invoking his privilege to every question except his name and address. Ballow even refused to answer a question asking him to state his line of business. Texas Capital argues Ballow's assertion of the Fifth Amendment to questions concerning his dealings with Texas Capital unfairly implicated Texas Capital in criminal activity.

■ A jury may draw an adverse inference against a party who pleads the Fifth Amendment. *See Baxter*, 425 U.S. at 318, 96 S.Ct. at 1558; *Denton*, 897 S.W.2d at 763; *Lozano v. Lozano*, 983 S.W.2d 787, 791 (Tex.App.—Houston [14 Dist.] 1998). Refusal to answer questions by asserting the privilege is relevant evidence from which the finder of fact in a civil action may draw whatever inference is reasonable under the circumstances. *Lozano*, 983 S.W.2d at 791.

■ Appellees argue that "if the party who actually invoked the privilege before the jury cannot complain, a codefendant certainly cannot claim error." We do not agree with this logic. Texas Capital had no control over Ballow's testimony, and, in all likelihood, Ballow's refusal to answer questions relating to Texas Capital implicated it in criminal activity.

■ Evidence is unfairly prejudicial if it would tend to persuade a jury to determine an issue on an improper basis such as emotion or bias. *Evans v. State Bar of Texas*, 768 S.W.2d 326, 330 (Tex.App.—El Paso), *rev'd on other grounds*, 774 S.W.2d 656 (Tex.1989). It is reasonable to conclude Ballow's assertion of the Fifth Amendment may have resulted in the determination of issues on an improper basis such as emotion or bias.

Texas Capital requested a mitigating instruction. The Texas Supreme Court has held that if, after a party has pled the Fifth, evidence gives rise to two equally consistent inferences so that neither inference is more probable than the other, neither inference can be made. *See Transport Ins. Co. v. Faircloth*, 898 S.W.2d 269, 278 (Tex.1995). Because Ballow pled the Fifth, an inference can be made that Texas Capital collaborated with him to perform illegal acts. It is just as likely that Texas Capital was unaware of Ballow's alleged illegal conduct. Either inference can be drawn from Ballow's pleading the Fifth. We hold it was error for the trial court not to give a mitigating instruction as to Texas Capital.

### 2. Harm Analysis

■ To obtain reversal of a judgment based on error in the admission or exclusion of evidence, an appellant must show that the trial court's ruling was error and that the error (1) probably caused the rendition of an improper judgment; or (2) probably prevented the appellant from properly presenting the case to the court of appeals. TEX.R.APP. P. 44.1. Because we have held it was error for the trial court not to give a mitigating instruction, we must now determine if this error was harmful.

The thrust of the case against Texas Capital was separate and apart from Ballow's actions. Texas Capital was sued for its individual actions in failing to supervise its broker and for failing to comply with the Texas Securities Act. There is no evidence in the record that the plaintiffs took the position that Ballow and Texas Capital were acting in collusion to defraud potential investors.

Having already found in Texas Capital's point of error five that there was sufficient evidence to support the jury's finding, regardless of what Ballow said or did not say, we find the error was harmless, because it did not cause the rendition of an improper judgment.

We overrule Texas Capital's point of error 10.

### Conclusion

We affirm the judgment against Ballow and Texas Capital.

### OPINION ON MOTION FOR REHEARING

PER CURIAM.

The Court issued its opinion in this appeal on May 17, 2001. On June 1, 2001, appellant, Butch Ballow, filed a timely motion for rehearing. On June 27, 2001, Ballow and appellees, J.D. Sandefer III and Stephen F. Smith, filed a joint motion to dismiss Ballow's appeal and to dismiss Ballow's motion for rehearing. The Court **grants** the joint motion to dismiss as follows:

(1) The motion for rehearing of appellant, Butch Ballow, is **dismissed.**

(2) The appeal of appellant, Butch Ballow, is **dismissed**, and the conclusion in this Court's opinion of May 17, 2001 on pages 2 and 35, affirming the judgment against appellant Butch Ballow, is **withdrawn.**

(3) Except as set forth above, this Court's opinion of May 17, 2001 remains unchanged.

(4) The judgment issued on May 17, 2001, is withdrawn and replaced by the corrected judgment attached hereto.

It is so **ORDERED, ADJUDGED, AND DECREED.**