# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---
## NO. 03-13-00858-CV
---

**M. Z. and R. B., Appellants**

**v.**

**Texas Department of Family and Protective Services, Appellee**

---
### FROM THE DISTRICT COURT OF HAYS COUNTY, 428TH JUDICIAL DISTRICT
### NO. 13-1310, HONORABLE R. BRUCE BOYER, JUDGE PRESIDING
---

## M E M O R A N D U M   O P I N I O N

M.Z. and R.B. appeal the trial court's final order terminating their parental rights to their child, K.F.B., following a bench trial.[1]  *See* Tex. Fam. Code § 161.001.  They challenge the sufficiency of the evidence to support the trial court's findings as to the predicate statutory grounds and the child's best interest.  *See id*. § 161.001(1)(D), (E), (2).  For the reasons that follow, we affirm the trial court's final order of termination.

## BACKGROUND

K.F.B. was born on April 2, 2009, and lived with both of her parents in California until the child and R.B., the father, moved to Texas in 2011.  R.B. was abusing prescription drugs

---

[1] We use initials to refer to appellants and their child.  *See* Tex. Fam. Code. § 109.002(d); Tex. R. App. P. 9.8.  Appellants are represented by different counsel and filed separate briefs with this Court.

and moved to Texas to receive help from his father.[2] M.Z. came to Texas a few months later and moved into a travel trailer with them. The trailer was on R.B.'s father's property. R.B.'s father lived with his wife in a house on the property, and they helped take care of the child. R.B.'s father's wife, however, was in a serious accident in September of 2012. As a result of the accident, she is a quadriplegic. After the accident, R.B.'s father and his wife were away from home for extended periods of time and were unable to provide the same level of support to M.Z., R.B., and the child.

The relationship between R.B. and M.Z. was volatile and unhealthy. According to M.Z., R.B. physically, emotionally, and sexually abused her. After R.B.'s father's wife's accident, the home situation worsened. M.Z. left R.B., taking the child with her, and went to a women's shelter in February 2013.

Around this time, the Department of Family and Protective Services and the police became involved with the family. The police became involved after the child made an outcry statement to M.Z. of sexual abuse by R.B. The child was interviewed by a forensic interviewer in March 2013 concerning the sexual abuse allegations, and M.Z. was interviewed in April 2013 by a peace officer investigating the sexual abuse allegations. The child told the interviewer that R.B. touched her "privates" with his fingers and put his "private" inside her "private," that R.B. "hurt" her, that she was "screaming" for her mother, and that R.B. told her that he would "kill" her if she told anyone.[3] M.Z. told the officer about the child's outcry of R.B.'s sexual abuse and threat with

---

[2] Whether R.B. was abusing drugs was disputed at trial. R.B. testified that he took pain medication for an injury and that doctors had prescribed the medication.

[3] During the interview, the child identified the locations of different body parts including "privates" on pictures of a girl and boy provided by the interviewer.

2

a knife to never disclose the sexual abuse. R.B. was arrested in April 2013 and indicted for aggravated sexual abuse assault of a child under six years of age and for indecency with a child by sexual conduct. A protective order to protect the child and M.Z. from R.B. was entered.

R.B. remained in jail after his arrest. M.Z. and the child communicated with R.B. by telephone, and M.Z. brought the child with her to the jail to visit R.B. several times in May and June 2013. On June 6, 2013, the child was interviewed again by a forensic interviewer, and she recanted her allegations against R.B. and made allegations against her grandfather, R.B.'s father. Around this time, the Department received a referral alleging neglectful supervision of the child by M.Z. based on the jail visits with R.B. A warrant was issued for M.Z.'s arrest on June 20, 2013, for violating the protective order as a party to the offense. *See* Tex. Penal Code §§ 7.01–.02, 25.071.[4] M.Z. also was indicted for the offense of endangering a child and a capias was issued on July 12, 2013.

The Department filed a petition for termination of parental rights on June 21, 2013. On July 1, 2013, an adversary hearing was held pursuant to section 262.205 of the Family Code, and the trial court entered temporary orders. *See* Tex. Fam. Code § 262.205. In its temporary orders, the trial court waived the requirement of a service plan based on aggravated circumstances for both parents. *See id.* § 262.2015(b)(3)(E), (I).

---

[4] In the affidavit of probable cause for arrest warrant, the peace officer averred: (i) the protective order ordered R.B. not to communicate with M.Z. or the child or to go within 200 yards of M.Z. or the child; (ii) during the visits to the jail in May and June, the child was within 200 yards of R.B. and directly communicated with him; and (iii) by taking the child to the jail, M.Z. encouraged the commission of the offense of violation of the protective order. *See* Tex. Penal Code §§ 7.02(a)(2) ("A person is criminally responsible for an offense committed by the conduct of another if: . . . acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense."), 25.071 (offense of violation of protective order preventing offense caused by bias or prejudice).

The case proceeded to a bench trial in November 2013. M.Z. was in California and did not personally appear for the trial.[5] The witnesses included a clinical social worker who provided therapy to the child, the forensic interviewers of the child, the program director at one of the child advocacy centers where the child's forensic interview occurred, R.B., R.B.'s father and stepbrother, the child's guardian ad litem, a Child Protective Services (CPS) caseworker who was assigned to the case, and the peace officer who investigated the sexual abuse allegations and interviewed M.Z. The exhibits included the video recordings of the forensic examiners' interviews of the child and the officer's interview of M.Z. and the audio recordings of conversations between R.B., M.Z., and the child on the telephone and during jail visits. The indictments of R.B. for aggravated sexual abuse assault of a child under six years of age and for indecency with a child by sexual conduct, the complaints and warrant for M.Z.'s arrest for the offense of violating the protective order, and the indictments and capias for the offense of endangering a child also were admitted as exhibits. At the time of the trial, the arrest warrant and capias remained outstanding.

The trial court terminated R.B.'s parental rights based on section 161.001(1)(E) of the Family Code and M.Z.'s rights based on section 161.001(1)(D) and its findings that termination of both parents' rights was in the child's best interest. *See id.* § 161.001(1)(D), (E), (2). Both parents filed motions for new trial, which were denied. This appeal followed.

---

[5] M.Z. appeared by and through her attorney.

4

**ANALYSIS**

To terminate parental rights, the Department has the burden to prove one of the predicate grounds in section 161.001(1) of the Family Code and that termination is in the best interest of the child. *See id.* § 161.001(1), (2); *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). The applicable standard of proof is the clear and convincing standard. Tex. Fam. Code § 161.206(a); *see In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002) (due process requires clear and convincing standard of proof in parental termination cases). The clear and convincing standard is "'that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" *In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002) (quoting *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979)); *see also* Tex. Fam. Code § 101.007 (defining "clear and convincing evidence"). Although "parental rights are of constitutional magnitude," "it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *In re C.H.*, 89 S.W.3d at 26.

Appellants raise legal and factual sufficiency challenges to the evidence. Legal sufficiency review of the evidence to support a termination finding requires a court to "look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d at 266. In reviewing the factual sufficiency of the evidence to support a termination finding, an appellate court reviews the record to determine "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations." *In re C.H.*, 89 S.W.3d at 25; *see also In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (describing factual

5

sufficiency standard of review in appeals from termination orders and noting that appellate court "must give due deference" to factfindings and "not supplant" its own judgment).

**Termination of R.B.'s parental rights under section 161.001(1)(E)**

As part of his appellate issue, R.B. challenges the factual sufficiency of the evidence to support termination of his parental rights under section 161.001(1)(E) of the Family Code. *See* Tex. Fam. Code § 161.001(1)(E). The trial court found by clear and convincing evidence that R.B. "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child [K.F.B.]." *See id*. R.B. urges that the evidence is factually insufficient to support the trial court's finding because there was no medical evidence to show that a sexual assault had occurred and M.Z. "coached" the child before both forensic interviews.

"'Endanger' means 'to expose to loss or injury; to jeopardize.'" *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (quoting *Texas Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). "Although 'endanger' means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the conduct be directed at the child or that the child actually suffers injury." *Id*. The relevant inquiry under section 161.001(1)(E) is whether evidence exists that the endangerment of the child's well-being was "the direct result of Appellant's conduct, including acts, omissions, or failures to act." *In re M.E.-M.N.*, 342 S.W.3d 254, 262 (Tex. App.—Fort Worth 2011, pet. denied) (citation omitted). "Additionally, termination under subsection (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent." *Id*.

6

Here, the trial court could have credited the evidence of R.B.'s sexual abuse of the child and R.B.'s imprisonment to support a finding that R.B. engaged in a conscious course of conduct that endangered the child. *See Boyd*, 727 S.W.2d at 533 ("[I]mprisonment is certainly a factor to be considered by a trial court on the issue of endangerment."). The video recordings of the forensic examiners' interviews of the child in March and June 2013 and the officer's interview of M.Z. in April 2013 were admitted as exhibits. Although the child recanted the allegations against R.B. in the second interview, there was evidence that supported a finding that the child was "coached" prior to that interview. The program director, who was also a forensic examiner, testified that visiting the father could have had a "huge impact," that it is not very hard to get a pre-school child to change her story, and the director did not see the same "red flags" in the first interview as she saw in the second one.[6] It was undisputed that M.Z. took the child to the jail to visit R.B. multiple times between the first and second interviews.

During her interview with the officer in April 2013, M.Z. told the officer that she believed the child's allegations against R.B. and that her child's "privates" hurt and were irritated after they moved to Texas. She took the child to the emergency room on more than one occasion because there was blood in her child's urine and the urine was "cloudy." The child also told M.Z. that R.B. had threatened her with a knife if she told anyone what had happened, and R.B. asserted his right to remain silent under the Fifth Amendment when questioned if he ever had sexual contact with his child. *See* U.S. Const. amend. V; *Texas Capital Secs., Inc. v. Sandefer*, 58 S.W.3d 760, 779

---

[6] In the second interview, the child told the forensic examiner that R.B. "told" her that it was "all about grandpa."

7

(Tex. App.—Houston [1st Dist.] 2001, pet. denied) (citing *Baxter v. Palmigiano,* 425 U.S. 308, 318 (1976)) (noting that factfinder in civil case "may draw an adverse inference against a party who pleads the Fifth Amendment"); *see also* Tex. R. Evid. 513(c). In contrast with his son's testimony, R.B.'s father affirmatively denied any sexually inappropriate conduct with the child.[7]

Further, there was also evidence that R.B. abused drugs while taking care of the child. R.B. admitted that he took pain medication for an injury, R.B.'s father testified that his son had a problem with prescription drugs, M.Z. stated that R.B. was a "drug addict" in her interview with the officer, and R.B. again invoked his right to remain silent when asked whether he had taken care of his child while under the influence of pain medication. *See In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009) ("[A] parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct."); *Pruitt v. Texas Dep't of Family & Protective Servs.*, No. 03-10-00089-CV, 2010 Tex. App. LEXIS 10272, at *15 (Tex. App.—Austin Dec. 23, 2010, no pet.) (mem. op.) (noting that evidence of drug use was relevant to issue of endangerment and that "evidence that a parent abused drugs while children were in her custody supports a finding of termination" (citing, among other authority, *In re J.O.A.*, 283 S.W.3d at 346)).

Multiple witnesses also testified about the abusive relationship between R.B. and M.Z. *See In re M.R.*, 243 S.W.3d 807, 818–19 (Tex. App.—Fort Worth 2007, no pet.) (holding that evidence of exposing a child to domestic violence supports an endangerment finding under subsections (D) and (E)); *In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet.

---

[7] In the second interview, the child told the forensic examiner that her uncle, R.B.'s stepbrother, was present when her grandfather touched her "privates." But the stepbrother testified that he had never seen the grandfather have inappropriate sexual contact with the child.

8

denied) (noting that conduct subjecting child to life of instability and uncertainty endangers a child's emotional and physical well-being). The clinical social worker testified that the child described domestic violence at home, including that R.B. "tried to throw mother out a window" and "hit" and "hurt" her. R.B.'s father testified that M.Z. and R.B. "had a volatile relationship. A lot of yelling and screaming and threatening and cursing," which "[o]ften" occurred in front of the child. During her interview with the officer, M.Z. described numerous incidents in which R.B. was "choking," "yelling," "push[ing]," "dragg[ing]," and "torturing" her. According to M.Z., the child witnessed many of these incidents.

Based on our review of the record, we conclude that the evidence was such that the trial court reasonably could have formed a firm belief or conviction that R.B. engaged in conduct that endangered the physical or emotional well-being of the child. *See* Tex. Fam. Code § 160.001(1)(E); *In re C.H.*, 89 S.W.3d at 25. Thus, we conclude that the evidence was factually sufficient to support the trial court's finding as to R.B. under section 161.001(1)(E) and overrule the part of R.B.'s issue challenging this finding.

**Termination of M.Z.'s rights under section 161.001(1)(D)**

In her first appellate issue, M.Z. challenges the legal and factual sufficiency of the evidence to support termination of her parental rights under section 161.001(1)(D) of the Family Code. *See* Tex. Fam. Code § 161.001(1)(D). The trial court found by clear and convincing evidence that M.Z. "knowingly placed or knowingly allowed the child [K.F.B.] to remain in conditions or surroundings which endanger the physical or emotional well-being of the child [K.F.B.]." *See id.*

9

The focus of subsection (D) is "the child's living environment, rather than the parent's conduct, though parental conduct is certainly relevant to the child's environment." *In re A.S.*, 261 S.W.3d 76, 83 (Tex. App.—Houston [14th Dist.] 2008, pet. denied). "A child is endangered when the environment creates a potential for danger that the parent is aware of but disregards." *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.) (op. on reh'g) (citing *In re S.M.L.*, 171 S.W.3d 472, 477 (Tex. App.—Houston [14th Dist.] 2005, no pet.)); *see In re A.S.*, 261 S.W.3d at 83. "Inappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in his home is a part of the 'conditions or surroundings' of the child's home under section 161.001(1)(D)." *In re M.R.J.M.*, 280 S.W.3d at 502 (citing *Castorena v. Texas Dep't of Protective & Regulatory Servs.*, No. 03-02-00653-CV, 2004 Tex. App. LEXIS 3753, at \*8 (Tex. App.—Austin Apr. 29, 2004, no pet.) (mem. op.)).

Much of the evidence described above in our analysis of R.B.'s issue demonstrates that the child's living environment created a potential for danger that M.Z. was aware of but disregarded. *See id.* M.Z. told the officer who interviewed her in April 2013 that she believed her child's allegations against R.B., and she described in detail R.B.'s physical, emotional, and sexual abuse for a period of time exceeding a year. *See id.*; *In re M.R.*, 243 S.W.3d at 818–19 (exposing child to domestic violence supports endangerment finding under subsection (D)). Even after M.Z. left R.B. and he was arrested, M.Z. took the child to visit with R.B. in jail, despite the risks of exposing the child to the alleged perpetrator and violating the protective order. *See In re Tidwell*, 35 S.W.3d 115, 119–20 (Tex. App.—Texarkana 2000, no pet.) (concluding that "not necessary for

[mother] to have had certain knowledge that one of the offenses actually occurred" and that "sufficient that she was aware of the potential danger to the children and disregarded the risk" to support termination under subsection (D)).

Viewing the evidence in the light most favorable to the endangerment finding under subsection (D), we conclude that the trial court could have formed a firm belief or conviction that M.Z. "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." *See* Tex. Fam. Code § 160.001(1)(D); *In re J.F.C.*, 96 S.W.3d at 266. Further, based on our review of the record, we conclude that the evidence is such that the trial court reasonably could have formed a firm belief or conviction about the truth of the State's endangerment allegations against M.Z. *See In re C.H.*, 89 S.W.3d at 25. Thus, we conclude that the evidence was legally and factually sufficient to support the trial court's finding as to M.Z. under section 161.001(1)(D) and overrule M.Z.'s first issue.

### *Best Interest Findings*

As part of R.B.'s first issue and in M.Z.'s second issue, appellants challenge the sufficiency of the evidence to support the trial court's findings that termination of their respective parental rights was in the best interest of their children. *See* Tex. Fam. Code § 161.001(2). R.B. challenges the factual sufficiency of the evidence, and M.Z. challenges the legal and factual sufficiency of the evidence to support the trial court's best interest findings. R.B. focuses on the Department's lack of an approved relative placement for the child and the child's love for her

11

parents, and M.Z. focuses on the child's wishes and the lack of services that the Department provided to her.[8]

Factors that courts consider in assessing the best interest of a child include: (i) desires of the child, (ii) the stability of the home or proposed placement, (iii) parental abilities, (iv) the emotional and physical needs of the child now and in the future, (v) the emotional and physical danger to the child now and in the future, (vi) the plans for the child by the individual or agency seeking custody, (vii) the programs available to assist these individuals to promote the best interest of the child, (viii) acts or omissions by the parent showing that the parent-child relationship was not proper, and (ix) any excuses for the parent's conduct. *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976); *see also* Tex. Fam. Code § 263.307 (stating that "prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest" and listing factors that court should consider "in determining whether the child's parents are willing and able to provide the child with a safe environment"). No one factor is controlling, and evidence presented to satisfy the predicate ground finding may also be probative of the child's best interest. *In re C.H.*, 89 S.W.3d at 28; *Pruitt,* 2010 Tex. App. LEXIS 10272, at *22–23.

---

[8] As previously stated, the trial court waived the requirement of a service plan based on aggravated circumstances for both parents in the temporary orders. *See* Tex. Fam. Code § 262.2015(b)(3)(E) (sexual assault), (I) (abandoning or endangering a child). Because a final order has been entered, the temporary orders are moot and not subject to review on appeal. *See In re D.W.*, No. 01-13-00880-CV, 2014 Tex. App. LEXIS 4034, at *7 (Tex. App.—Houston [1st Dist.] Apr. 11, 2014, no pet. h.) (mem. op.). Further, M.Z. has not provided the record from the hearing on temporary orders and thus we must presume that sufficient evidence supported the trial court's findings. *See Bennett v. Cochran*, 96 S.W.3d 227, 230 (Tex. 2002) (per curiam); *Schafer v. Conner*, 813 S.W.2d 154, 155 (Tex. 1991) (per curiam).

Evidence supported findings that M.Z. and the child were bonded, that the child missed her mother, and that the child loved both of her parents. Other evidence, however, demonstrated that the parents were unable to take care of the child or to provide the child with a stable home. R.B. was incarcerated pending trial and M.Z. had an outstanding warrant for her arrest. R.B.'s proposed placement for the child if his rights were not terminated was for the child to live in California with his grandmother and great-grandmother, but he did not have a plan for transporting the child to California and he was unable to provide for the child financially. Further, other evidence showed that the grandmother and great-grandmother were not an appropriate placement.[9] As to M.Z.'s plans for the child if her rights were not terminated, she did not appear for trial, choosing to remain in California, but other evidence supported a finding that she hoped one day for the family to be reunited.[10] Despite the risk of violating the protective order, M.Z. maintained contact with R.B. and allowed him to see the child after he was incarcerated.[11]

In contrast with the parents' plans for the child, the evidence showed that the child was safe and taken care of in her current placement, a non-adoptive foster home. The clinical social

---

[9] The State of California did a home study on the grandmother and great-grandmother at the Department's request and did not approve placement in their home. *See* Tex. Fam. Code § 162.102 (adoption of "Interstate Compact on the Placement of Children"). R.B.'s stepbrother also testified that R.B. told him that R.B. moved to Texas because living with his grandmother and great-grandmother had been a "negative environment" and that they were stealing his pain medication.

[10] The exhibits included recent posts from Facebook by M.Z. about her child and R.B. and the audio recordings from phone conversations and jail visits between R.B., M.Z, and the child from April 19, 2013, to June 19, 2013.

[11] In one of the first audio recordings of conversations between M.Z. and R.B., they discuss the protective order and R.B. tells M.Z. that violating the protective order could put him in jail for a year. The child is also heard during this conversation.

13

worker testified that the child was "adjusting very well" to her new school, home, and circumstances. The Department's plan for the child was for adoption by a relative if the parents' rights were terminated. The Department was considering placing the child with the child's uncle, R.B.'s stepbrother, and the stepbrother testified that he believed that the child should live with him and his wife.

The evidence of the relationship between R.B. and M.Z. also supported findings that the child's placement with either parent would be in an unstable home, that her emotional or physical needs would not be met, and that she would be in emotional or physical danger. In addition to the evidence of domestic violence and sexual abuse, R.B.'s father testified about his concerns for the child's safety while the child was living in the trailer with her parents. He described M.Z.'s "erratic" behavior, R.B.'s "drug abuse," and the parents' failure to provide adequate food for the child. R.B.'s father believed that neither parent could take care of the child. R.B.'s stepbrother testified that it was a regular occurrence to see R.B. under the influence of drugs and that it had been about ten years since he saw R.B. being a self-sufficient, responsible adult. R.B. answered "Yes" when asked if he and M.Z. were "struggling" and living in "pretty rough circumstances" for over a year, and R.B. testified that he and M.Z. were "just always arguing," that M.Z. was "bipolar," "erratic," and not to be trusted, and that he did not think that M.Z. should be the primary conservator of the child.

Further, the trial court could have credited the evidence concerning the parents' conduct showing that the parent-child relationships were not proper. The exhibits included the video recordings of the forensic interviews of the child and the interview of M.Z. The clinical social worker also testified that the relationship between the child and her parents was not appropriate. The

14

clinical social worker testified that the child was "parentified. She's had to take on the role of worrying about her mother after scenes of domestic violence by her account." The clinical social worker also testified that the child "reported feeling extremely frightened by her father" and that he "damaged her mother, hit her, . . . and hurt her."

The trial court also could have credited the testimony of the guardian ad litem and the CPS caseworker. They both testified that it was in the child's best interest to terminate the parents' rights. The guardian ad litem explained her reasons for her best-interest conclusion:

> Due to the nature of the abuse . . . that occurred and the fact that . . . her mother was not protective of her once she made those outcries.

The caseworker reasoned that termination was in the child's best interest to give the child "some permanency" and to "keep her safe." The caseworker testified that M.Z. "has shown that she's not going to be protective of [the child], so I think in order to keep [the child] safe in the future, then her rights need to be terminated."

Viewing the evidence in the light most favorable to the best interest findings, we conclude that the trial court could have formed a firm belief or conviction that terminating the parental rights of M.Z. was in the best interest of the child. *See* Tex. Fam. Code § 160.001(2); *In re J.F.C.*, 96 S.W.3d at 266. Further, based on our review of the record, we conclude that the evidence is such that the trial court reasonably could have formed a firm belief or conviction that termination of the parental rights of M.Z. and R.B. was in the best interest of the child. *See In re C.H.*, 89 S.W.3d at 25. Thus, we conclude that the evidence was legally and factually sufficient to support the trial court's best interest finding as to M.Z.'s parental rights and factually sufficient

15

as to R.B.'s parental rights.  We overrule M.Z.'s second issue and the part of R.B.'s issue that challenges the trial court's best interest finding.

## CONCLUSION

Having overruled appellants' issues, we affirm the trial court's final order of termination.

_____

Melissa Goodwin, Justice

Before Justices Puryear, Goodwin, and Field

Affirmed

Filed:  May 22, 2014

16